**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARIO AVIGNONE,<br>*Plaintiff*,<br>v.<br>NATIONAL RAILROAD PASSENGER CORPORATION, *et al.*,<br>*Defendants.* | Civil Action No. 25-2199 (RDM) |

**MEMORANDUM OPINION**

Plaintiff Mario Avignone brings this case to challenge his termination by his former employer, the National Railroad Passenger Corporation ("Amtrak"), because of his refusal to comply with Amtrak's COVID-19 safety measures. Originally proceeding *pro se*, Plaintiff filed a complaint, an amended complaint, and a second amended complaint. Although Plaintiff has now retained counsel, his second amended complaint remains the operative pleading. It asserts claims under the Occupational Safety and Health Act ("OSHA Act"), the Railway Labor Act ("RLA"), 42 U.S.C. § 1985, and the U.S. Constitution against Amtrak, a union that represents Amtrak employees, and former President Joe Biden. Plaintiff's claims are premised on his contentions that Amtrak unlawfully discharged him for refusing to comply with the company's COVID-19 vaccination and testing requirements, despite his stated religious objection to those policies; that the union breached its duty of fair representation by failing adequately to represent him in his wrongful discharge hearing and by failing to challenge Amtrak's COVID-19 policies; that Defendants fraudulently concealed his right to refuse COVID-19 vaccination and testing; that former President Biden's Executive Order and related guidance requiring federal contractors

to adopt COVID-19 safety measures violated several constitutional provisions and the OSHA Act; and, finally, that Amtrak, the union, and President Biden conspired to deprive Plaintiff of his constitutional right to refuse to comply with Amtrak's COVID-19 policies based on his religious beliefs. Plaintiff also seeks to bring class claims on behalf of "many other employees . . . terminated under the same set of facts." Dkt. 10 at 67 (SAC ¶ 305).

Amtrak and the union, Transportation Communications Union/IAM ("TCU/IAM"), each move to dismiss.[1] Amtrak posits that Plaintiff's second amended complaint fails to comply with Rule 8, that each of Plaintiff's claims against Amtrak fails as a matter of law or because Plaintiff has failed plausibly to plead facts from which to infer a violation occurred, and that Plaintiff's class allegations should be stricken because Plaintiff failed to seek class certification within the 90-day window required by Local Rule 23.1. TCU/IAM, for its part, contends that Plaintiff lacks standing to bring his representation-related claims against TCU/IAM because TCU/IAM is not Plaintiff's union and that any claims against Plaintiff's union must be construed as claims for breach of the duty of fair representation, which are barred by the six-month statute of limitations applicable to such claims. TCU/IAM also argues that Plaintiff's conspiracy claim is so preposterous that it fails to present a federal question and thus must be dismissed under Rule 12(b)(1) for lack of subject-matter jurisdiction.

After Defendants filed their motions to dismiss, Plaintiff formally retained counsel, *see* Dkt. 22, although some of Plaintiff's earlier filings suggest that counsel assisted him in drafting

[1] Former President Biden has not answered or moved to dismiss Plaintiff's second amended complaint. Although Plaintiff now asserts that he intended to name Biden in both his individual and official capacity and that he intended to effect service on President Biden pursuant to Federal Rule of Civil Procedure 4(i), *see* Dkt. 42 at 2–3, Plaintiff's second amended complaint names President Biden only in his individual capacity, *see* Dkt. 10 at 7, 13 (SAC ¶¶ 1, 16(b)). According to Plaintiff's most recent filing, he has yet to serve President Biden in his individual capacity. *See* Dkt. 47 at 8.

his *pro se* pleadings, *see* Dkt. 14 ("I have a lawyer who is out of state helping me."). Plaintiff, through counsel, then opposed the pending motions to dismiss and requested leave to file a third amended complaint, which maintains many of Plaintiff's original allegations but seeks to add allegations against former President Biden in his official capacity and to add the union that both TCU/IAM and Plaintiff have identified as the correct union, UNITE HERE Local 23. *See* Dkt. 26 (seeking, among other things, leave to file an amended complaint to add the correct union as a defendant); *see also* Dkt. 36; Dkt. 44; Dkt. 47.

After Plaintiff declined to drop TCU/IAM from the case despite acknowledging that he was a member of UNITE HERE, TCU/IAM moved for Rule 11 sanctions against Plaintiff's counsel. TCU/IAM contends that counsel's refusal to dismiss TCU/IAM, after conceding in a filing that TCU/IAM was not Plaintiff's union, *see* Dkt. 26 at 2, constitutes intentional harassment under Rule 11(b)(1) and reflects a legal position that counsel knew or should have known was unsupported by fact or law and for which there is no nonfrivolous argument for changing the law in violation of Rule 11(b)(2). *See* Dkt. 39. Plaintiff's counsel opposes the motion and argues that TCU/IAM's Rule 11 motion is "misleading" about how Amtrak employees' unions are structured and about the law governing Plaintiff's claims. *See* Dkt. 40 at 19–20. TCU/IAM responds that Plaintiff's arguments about the structure of the Amtrak unions reflect a new legal theory that is not properly advanced in an opposition to a Rule 11 motion. *See* Dkt. 41 at 4–5.

For the following reasons, the Court will **GRANT** Defendants' motions to dismiss, Dkt. 21 & Dkt. 32, and will **DISMISS** Plaintiff's second amended complaint in its entirety without prejudice; will **DENY** Plaintiff's motion for leave to file the proposed, third amended complaint, Dkt. 44, as futile; and will **DENY** TCU/IAM's motion for sanctions, Dkt. 39, but will caution

Plaintiff's counsel that any similar behavior in the future may, as appropriate, warrant the imposition of sanctions.

# I. BACKGROUND

## A. Statutory Background

### 1. *Occupational Health and Safety Act*

Congress enacted the OSHA Act in 1970 to promote "safe and healthful working conditions" for "every working man and woman in the Nation." 29 U.S.C. § 651(b). To achieve these goals, the Act authorizes the Secretary of Labor, acting through the Occupational Safety and Health Administration ("OSHA"), to promulgate rules establishing health and safety standards, *id.* § 655, with which employers must comply, *id.* § 654(a)(2). A corporation "engaged in a business affecting commerce who has employees" is an "employer" required to comply with OSHA's health and safety standards. *Id.* § 652(5). If, after an inspection or investigation (which employees and their representatives may request, *see id.* § 657(f)(1)), the Secretary believes that an employer has violated its statutory obligations or any of the published health and safety standards, he may issue a citation to the employer. *Id.* § 658(a). If the employer contests the citation, the Occupational Health and Safety Review Commission ("the Commission") must provide an opportunity for a hearing, after which the Commission must issue an order affirming, modifying, or vacating the citation or directing other appropriate relief. *Id.* § 669(c). Affected employees or representatives of affected employees may participate in these hearings. *Id.* When the Commission issues a final order related to a citation, "[a]ny person adversely affected or aggrieved by" that order may seek review by filing a petition either in a United States court of appeals for the circuit in which the violation allegedly occurred or in the Court of Appeals for the District of Columbia Circuit. *Id.* § 660(a). The Secretary may obtain review or enforcement of a final order by the Commission in the same manner. *Id.* § 660(b).

The OSHA Act prohibits employers from discharging or discriminating against employees because they have complained of health and safety violations or caused the initiation of any proceedings under the Act. *Id.* § 660(c)(1). If an employee believes that he has suffered a discriminatory discharge or other discrimination, he may file a complaint with the Secretary of Labor within 30 days of the violation. *Id.* § 660(c)(2). The Secretary must investigate any such complaint "as he deems appropriate" and, if he determines that a violation has occurred, "bring an action in any appropriate United States district court" against the person who committed the violation. *Id.* The provision says nothing about whether the employee who has suffered the allegedly discriminatory action may also bring a suit directly in federal district court.

Separate from the provisions governing the promulgation and enforcement of health and safety standards, the OSHA Act authorizes the Secretary of Health and Human Services ("HHS") to conduct research related to occupational safety and health, often in consultation with the Secretary of Labor. *See id.* § 669. The Secretary of HHS must also consult with the Secretary of Labor to develop research plans related to identifying the criteria on which the Secretary of Labor's occupational health and safety standards will be based, including criteria for identifying toxic substances. *Id.* § 669(a)(2). To do so, the Act contemplates that the Secretary of HHS may need to prescribe regulations requiring employers to record and report on employees' exposure to potentially toxic substances. *See id.* § 669(a)(5). The Act further authorizes the Secretary of HHS "to establish such programs of medical examinations and tests as may be necessary for determining the incidence of occupational illnesses and the susceptibility of employees to such illnesses." *Id.* The provision limits the HHS Secretary's authority to research toxic substances as follows: "Nothing in this or any other provision of this chapter shall be deemed to authorize or require medical examination, immunization, or treatment for those who object thereto on

religious grounds, except where such is necessary for the protection of the health or safety of others." *Id.* The Act contains no provision expressly authorizing a private right of action against employers whose own policies require medical testing or immunization.

2. *Railway Labor Act*

"The Railway Labor Act . . . governs labor relations in the railroad and airline industries." *Davenport v. Int'l B'hd of Teamsters AFL-CIO*, 166 F.3d 356, 361 (D.C. Cir. 1999). Section 2 of the RLA gives employees "the right to organize and bargain collectively through representatives of their own choosing, and requires employers under the Act to bargain exclusively with the representatives so chosen." *Id.* (citing 45 U.S.C. § 152). The Supreme Court has interpreted this provision and others in the statute to imply a duty of fair representation ("DFR") owed by unions in these industries to their members. *See Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 74–76 (1991); *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 199–203 (1944). This duty of fair representation obligates unions "to serve the interests of all members without hostility or discrimination toward any, to exercise [their] discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).

3. *42 U.S.C. § 1985*

Section 1985 provides a private right of action against those who engage in conspiracy to interfere with civil rights. *See* 42 U.S.C. § 1985. Subsection three provides that:

> [i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*Id.* § 1985(3).

### B. Factual and Procedural Background

For the purpose of resolving Defendants' motions to dismiss, the following facts, which are taken from Plaintiff's second amended complaint, are accepted as true. *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation modified). The Court will also consider, as appropriate, documents "incorporated in the complaint and matters [subject to] judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

Plaintiff Mario Avignone was a train attendant employed for many years by Amtrak at its Chicago station. Dkt. 10 at 12 (SAC ¶ 14). On August 11, 2021, Amtrak's Chief Executive Officer Bill Flynn issued a companywide letter outlining a new COVID-19 vaccination and testing policy that Amtrak was adopting. Dkt. 10 at 26 (SAC ¶ 81); Dkt. 10-1 at 202 (SAC, Ex. 16 at 1). The policy mandated that all current employees be fully vaccinated by November 1, 2021, and further specified that anyone "who has not provided documentation of full vaccination by" that date would "be required to submit a negative COVID-19 test result weekly." Dkt. 10-1 at 202 (SAC, Ex. 16 at 1). But the letter also provided that employees "with a valid medical reason that prohibits COVID-19 vaccination or testing" or with "religious reasons" for objecting to the policy could seek reasonable accommodations. *Id.* at 203 (SAC, Ex. 16 at 2). Employees with accommodations who submitted a negative COVID-19 test "weekly or more frequently, as required" would be permitted to continue working. *Id.* at 204 (SAC, Ex. 16 at 3). Unvaccinated employees who did not obtain approved accommodations would be permitted to participate in the testing option at least on a temporary basis. *Id.* Noncompliant employees would first be placed on a temporary leave of absence, but, the letter explained, "[p]rolonged failure to submit to testing [would] be considered insubordinate, potentially resulting in termination of employment." *Id.*

On September 9, 2021, President Biden signed Executive Order 14042, which required federal executive departments and agencies to include in their contracts clauses requiring that federal contractors and subcontractors comply with COVID-19 safety guidance published by the Safer Federal Workforce Task Force. Dkt. 10 at 27 (SAC ¶ 82); Dkt. 10-1 at 223 (SAC, Ex. 18 at 1). The associated guidance directed contractors to require that covered employees be vaccinated for COVID-19 "unless legally entitled to an accommodation." Dkt. 10-1 at 208 (SAC, Ex. 17 at 1); *see also* Dkt. 10 at 27 (SAC ¶ 82). The guidance further provided that employers may be required to provide accommodations to employees who are unvaccinated because of a disability or "sincerely held religious belief, practice, or observance." Dkt. 10-1 at 212 (SAC, Ex. 17 at 5).

On September 21, 2021, Amtrak "informed all employees that the option to test instead of providing evidence of . . . vaccination was eliminated and [that] all employees were mandated to vaccinate or be placed on leave without pay." Dkt. 10 at 27 (SAC ¶ 84). Three days later, Plaintiff submitted to Amtrak a written notice that his religious faith required him to refuse the COVID-19 vaccine. *Id.* at 28 (SAC ¶ 85). On October 28, 2021, Amtrak sent Plaintiff a letter "approv[ing]" Plaintiff's religious accommodation. Dkt. 10-1 at 228 (SAC, Ex. 19 at 1). The letter informed Plaintiff that he would be placed on a 90-day unpaid personal leave of absence, with benefits for a period of time, effective December 8, 2021. *Id.*; Dkt. 10 at 28 (SAC ¶ 86).

On December 14, 2021, Amtrak announced that it would resume the COVID-19 testing option as an alternative to vaccination. Dkt. 10 at 28 (SAC ¶ 89). Six days later, Amtrak sent Plaintiff an email informing him of the testing alternative and offering him an opportunity to end his unpaid leave and return to work full time. *Id.* Plaintiff declined the offer on the grounds that both COVID-19 testing and vaccination violated his religious beliefs, instead seeking an

accommodation that allowed his return to work if he complied only with Amtrak's requirements for masks and personal sanitation. *Id.* (SAC ¶ 90). Amtrak declined, and Plaintiff remained on unpaid leave. *Id.* (SAC ¶ 91). Throughout the following months, Amtrak continued to inform Plaintiff that he was required to comply with its COVID-19 testing program and that his refusal might lead to disciplinary action. *Id.* (SAC ¶ 92); Dkt. 10-2 at 6 (SAC, Ex. 21 at 2). Plaintiff continued to object to COVID-19 testing on religious grounds. Dkt. 10 at 29 (SAC ¶ 93).

Amtrak sent Plaintiff a letter on June 10, 2022, informing him that he was noncompliant with the testing policy and that he had seven days to come into compliance before his noncompliance would be considered insubordination. *Id.* (SAC ¶ 94); Dkt. 10-2 at 23 (SAC, Ex. 22 at 1). On June 21, Amtrak sent Plaintiff a formal notice that he was being investigated for termination based on his noncompliance with the COVID-19 policy and directed him to attend a virtual hearing. Dkt. 10 at 29 (SAC ¶ 95); Dkt. 10-2 at 25 (SAC, Ex. 23 at 1). Plaintiff attended the hearing and was represented by his union representative. Dkt. 10-2 at 27 (SAC, Ex. 24 at 1). At the hearing, Plaintiff continued to object to the COVID-19 vaccination and testing policy on religious grounds. Dkt. 10 at 29 (SAC ¶ 96).

Amtrak issued a written decision on July 11, 2022, outlining the Hearing Officer's findings that Plaintiff had violated Amtrak's COVID-19 vaccine and testing policy. *Id.* (SAC ¶ 97); Dkt. 10-2 at 28 (SAC, Ex. 24 at 2). Plaintiff's employment was terminated on July 13, 2022. Dkt. 10 at 30 (SAC ¶ 98); Dkt. 10-1 at 2 (SAC, Ex. 1 at 1). On October 31, 2022, Amtrak sent Plaintiff a letter offering him "the opportunity to be reinstated to service on a leniency basis" with his "seniority and vacation rights restored" but without pay for time lost, conditioned on Plaintiff "accept[ing] responsibility" for the actions that led to his termination and waiving any

claim to damages as a result of his discharge. Dkt. 10 at 28 (SAC ¶ 87); Dkt. 10-2 at 2 (SAC, Ex. 20 at 1). Plaintiff declined the offer of reinstatement. Dkt. 10 at 28 (SAC ¶ 88).

On May 12, 2023, President Biden rescinded Executive Order 14042 and the related guidance. Dkt. 10 at 30 (SAC ¶ 99). After he did so, Plaintiff unsuccessfully applied several times for new positions at Amtrak. *Id.* (SAC ¶ 100); *see* Dkt. 10-2 at 30, 31 (SAC, Ex. 25 at 1, 2).

Plaintiff filed his first complaint in this action nearly three years after his termination, on July 1, 2025. *See* Dkt. 1. He has amended his complaint twice, each time adding additional defendants and allegations. *See* Dkt. 5 (FAC); Dkt. 10 (SAC). Plaintiff's second amended complaint asserts claims under the OSHA Act, D.C. law governing fraudulent concealment, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), various federal constitutional provisions, and 42 U.S.C. § 1985(3). Plaintiff's operative complaint also includes "class allegations" asserting that "many other employees may have been terminated under the same set of facts." Dkt. 10 at 67 (SAC ¶ 305).

The same day that he filed his second amended complaint, Plaintiff moved for summary judgment. *See* Dkt. 12. The Court denied that motion as premature because Defendants had not yet answered his complaint and because Plaintiff failed to comply with the Court's standing order. *See* Min. Order (Dec. 23, 2025).

Amtrak and TCU/IAM subsequently moved to dismiss all claims under Rules 12(b)(1) and 12(b)(6). *See* Dkt. 21; Dkt. 32. Amtrak argues that Plaintiff's complaint should be dismissed in its entirety because he has failed to comply with Rule 8's requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Amtrak further contends that Plaintiff's claims fail as a matter of law or for failure to

plead sufficient factual allegations to state a plausible claim for relief. TCU/IAM contends that Plaintiff lacks standing to bring his claims against TCU/IAM because Plaintiff is not a member of TCU/IAM but rather a different union, UNITE HERE Local 23. TCU/IAM also argues that all of Plaintiff's claims are repackaged claims for the breach of the duty of fair representation and are accordingly barred by the six-month statute of limitations applicable to such claims.

After Amtrak moved to dismiss, Plaintiff retained counsel, *see* Dkt. 22, who sought reconsideration of the Court's decision denying Plaintiff's motion for summary judgment as premature and procedurally improper, *see* Dkt. 32, and who filed a consolidated brief in opposition to both pending motions for summary judgment, *see* Dkt. 26. In the first of these motions, Plaintiff's counsel argued that the Court's requirements outlined in its standing order violate the Federal Rules of Civil Procedure; counsel continued to press for summary judgment briefing and a hearing; and counsel sought leave to amend Plaintiff's second amended complaint "to add UnitedHere [sic] union as a new defendant based on Plaintiffs [sic] inadvertent incorrect identification of TCU/IAM as his union when UnitedHere [sic] was actually the union to whom he paid his dues." *Id.* at 2. The Court denied Plaintiff's motion for reconsideration because Plaintiff's attempt to address the merits of Plaintiff's claims on summary judgment before the Court has determined whether the second amended complaint properly invokes the Court's jurisdiction or states a claim was premature. And the Court denied Plaintiff's motion for leave to amend because Plaintiff's request to amend his complaint was procedurally improper (because Plaintiff failed to include a proposed and redlined amended complaint) and moot (because Plaintiff had filed a superseding motion for leave to amend). *See* Min. Order (July 14, 2026).

TCU/IAM subsequently moved for the imposition of sanctions against Plaintiff's counsel under Rule 11, asserting that counsel's refusal to dismiss TCU/IAM as a defendant despite

conceding that Plaintiff's complaint identified the wrong union constitutes intentional harassment under Rule 11(b)(1) and violates Rule 11(b)(2)'s requirement that attorneys submit filings containing claims that are either "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). Plaintiff's counsel opposes that motion on the grounds that Plaintiff's claims are supported by law governing the scope of unions' representative duties and that Plaintiff's conspiracy claim is non-frivolous. *See* Dkt. 40.

Plaintiff also seeks leave to file his third amended complaint to clarify that his claims against President Biden seek to hold him liable in both his official and his individual capacities and to add "UNITE HERE Local 43" as a defendant. *See* Dkt. 44. In its response, TCU/IAM contends that "Plaintiff's motion should . . . be denied because—even after all of this time and after multiple filings identifying the correct union—Plaintiff is proposing to add another wrong defendant union to this case." Dkt. 46 at 1. As TCU/IAM points out, its previous filings had identified UNITE HERE Local *23*, rather than Local *43*, as the union to which Plaintiff belonged. *Id.* at 1–2. Rather than dispute TCU/IAM's assertion, Plaintiff in reply seeks leave "to correct that identification before filing an amended pleading," Dkt. 47 at 5, and to add yet another defendant, the Amtrak Service Workers Council ("ASWC"), because Plaintiff had "recently discovered" a Seventh Circuit decision from 1993 in which ASWC was named as a union defendant, *id.*at 2. Plaintiff then filed yet another proposed third amended complaint, this time seeking to add both ASWC and UNITE HERE Local 23 as defendants. *See* Dkt. 48-1.

Now pending before the Court are TCU/IAM's and Amtrak's motions to dismiss, Dkt. 21 & Dkt. 32; TCU/IAM's motion for Rule 11 sanctions, Dkt. 39; and Plaintiff's motion for leave to file a third amended complaint, Dkt. 44, all of which are ripe for the Court's review.

# II. LEGAL STANDARD

## A. Motions to Dismiss

The Court may dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) upon a defendant's motion or *sua sponte*, "where the claimant cannot possibly win relief." *Baker v. Dir., U.S. Parole Comm'n*, 916 F.2d 725, 726 (D.C. Cir. 1990) (citation modified). A motion to dismiss brought under Rule 12(b)(6) is designed to "test[] the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *id.* at 555–56.

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) seeking dismissal for lack of subject-matter jurisdiction may take one of two different forms. First, a Rule 12(b)(1) motion "may raise a 'facial' challenge to the Court's jurisdiction." *Hale v. United States*, No. 13-cv-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015). A facial challenge asks whether the complaint alleges facts sufficient to establish the court's jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 879 F.3d 339, 346–47 (D.C. Cir. 2018). In this posture, the Court must accept the factual allegations of the complaint as true and construe them in the light most favorable to the non-moving party. *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006) (collecting cases).

"Alternatively, a Rule 12(b)(1) motion may pose a 'factual' challenge to the Court's jurisdiction." *Hale*, 2015 WL 7760161, at *3. When a motion to dismiss is framed in this manner, "the [C]ourt may not deny the motion . . . merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant" but "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). "The [C]ourt has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," so long as it "afford[s] the nonmoving party an ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984) (citation modified).

Under both Rule 12(b)(6) and Rule 12(b)(1), the Court must review the sufficiency of Plaintiff's second amended complaint under the standards applicable to *pro se* pleadings. A *pro se* complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Naz v. Wright*, 177 F.4th 1242, 1246 (D.C. Cir. 2026). "This benefit is not, however, a license to ignore the Federal Rules of Civil Procedure." *Sturdza v. United Arab Emirates*, 658 F. Supp. 2d 135, 137 (D.D.C. 2009) (citation omitted). A *pro se* complaint must "still 'present a claim on which the Court can grant relief' to withstand a Rule 12(b)(6) challenge." *Smith v. Scalia*, 44 F. Supp. 3d 28, 36 (D.D.C. 2014) (citations omitted). Moreover, as with any other plaintiff, a *pro se* plaintiff must meet his burden of establishing subject-matter jurisdiction. *See, e.g., Green v. Stuyvesant*, 505 F. Supp. 2d 176, 176 (D.D.C. 2007).

**B. Leave to File Amended Complaint**

A plaintiff may amend his complaint once as a matter of right. *See* Fed. R. Civ. P. 15(a)(1). For subsequent amendments, the plaintiff must obtain either the opposing party's

written consent or the court's leave. Fed. R. Civ. P. 15(a)(2). The Court should grant leave to amend "freely" in the absence of circumstances "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

### C. Motion for Sanctions

Rule 11 requires an attorney presenting "a pleading, written motion, or other paper" to certify "to the best of the [attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that the material "is not being presented for any improper purpose, such as to harass;" that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;" and that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." *Id.* 11(c).

In deciding whether to impose sanctions, the Court must consider "(1) whether each presenting attorney 'conducted a reasonable inquiry,' (2) whether each presenting attorney 'determined that [the] papers filed with the court are well grounded in fact [and] legally tenable,' and (3) whether the papers were 'interposed for any improper purpose.'" *Jordan v. U.S. Dep't of Labor*, 273 F. Supp. 3d 214, 241 (D.D.C. 2017) (alterations in original) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)). "Rule 11 sanctions . . . are an extreme punishment for filing pleadings that frustrate judicial proceedings," and, accordingly, they are

not to be imposed "lightly." *Id.* "The test for sanctions under Rule 11 is an objective one that asks whether a reasonable inquiry would have revealed that there was no basis in law or fact for the asserted claim." *Hedgeye Risk Mgmt., LLC v. Heldman*, 412 F. Supp. 3d 15, 34 (D.D.C. 2019); *see Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 100 (D.D.C. 2007). The Court must also "take into consideration that Rule 11 sanctions are a harsh punishment, and what effect, if any, the alleged violations may have had on judicial proceedings." *Robinson-Reeder v. Am. Council on Educ.*, 626 F. Supp. 2d 11, 18 (D.D.C. 2009) (citation modified).

When the Court determines that a Rule 11 violation has occurred, the Court has discretion to select the appropriate sanction necessary to "protect the court from frivolous and baseless filings that are not well grounded, legally untenable, or brought with the purpose of vexatiously multiplying the proceedings." *Cobell v. Norton*, 211 F.R.D. 7, 10 (D.D.C. 2002) (citation modified). But "once the district court finds that a pleading is not well grounded in fact, not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or is interposed for any improper purpose, Rule 11 *requires* that sanctions of some sort be imposed." *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 852 (D.C. Cir. 1995) (emphasis in original and citation modified).

## III. ANALYSIS

The crux of Plaintiff's complaint is that Amtrak—in response to former President Biden's COVID-19 Executive Order and the related guidance and without objection by TCU/IAM—mandated that Plaintiff either receive the COVID-19 vaccine or undertake weekly COVID-19 testing as a condition of his employment, despite Plaintiff's asserted religious objection to vaccination and testing. Plaintiff's operative complaint challenges Amtrak's termination of his employment in response to his refusal to comply with its policy, TCU/IAM's inadequate

representation of him during his hearing and its failure to challenge Amtrak's COVID-19 policy, and President Biden's COVID-19 Executive Order and related guidance, as well as President Biden's public statements about COVID-19 vaccines.[2] In doing so, Plaintiff asserts claims under the OSHA Act, D.C. fraudulent concealment law, *Bivens*, the Railway Labor Act's implied duty of fair representation, 42 U.S.C. § 1985(3), and various other constitutional provisions. Plaintiff also seeks to proceed on behalf of similarly situated Amtrak employees, although he has yet to seek class certification.

The Court concludes that Plaintiff's complaint must be dismissed in its entirety. With respect to Plaintiff's claims against TCU/IAM, the Court concludes that Plaintiff lacks standing to sue TCU/IAM because the evidence put forth by the parties demonstrates that TCU/IAM was not the union that represented Plaintiff and thus owed him no duty of fair representation. Plaintiff's fair representation claim, as well as his remaining claims against TCU/IAM that in substance merely repackage his fair representation claim, must therefore be dismissed under Rule 12(b)(1).

Plaintiff's claims against former President Biden also fail, and the Court will dismiss them *sua sponte* because the Court lacks jurisdiction over some and Plaintiff "cannot possibly win relief," *Baker*, 916 F.2d at 726, on the rest. To the extent Plaintiff seeks to bring his claims against President Biden in his individual capacity for money damages, such claims are barred by President Biden's absolute immunity for all actions taken within the scope of his official

[2] Plaintiff's second amended complaint also, at times, suggests that Defendants may have committed a felony under D.C. law by "prescrib[ing]" a "medical treatment" (the COVID-19 vaccine) despite being non-physicians who are unlicensed to do so. Dkt. 10 at 21 (SAC ¶¶ 53–54). Because D.C. criminal law does not provide a basis for the Court to grant Plaintiff relief on his civil complaint, the Court will not consider these allegations. *See Agarwal v. United States*, No. 18-cv-03125, 2019 WL 2476613, at *3 (D.D.C. June 13, 2019); *Anderson v. Wiggins*, 460 F. Supp. 2d 1, 7–8 (D.D.C. 2006).

responsibility as President. And Plaintiff's remaining constitutional and *ultra vires* claims seeking declaratory and injunctive relief based on President Biden's Executive Order and guidance related to COVID-19 vaccination must be dismissed as moot because both the Executive Order and the related guidance were rescinded long ago.

As for Plaintiff's remaining claims against Amtrak, all must be dismissed under Rule 12(b)(6). Plaintiff lacks a private right of action to pursue his OSHA Act wrongful-discharge claim in federal court, and a *Bivens* remedy is unavailable against Amtrak for allegedly violating Plaintiff's substantive due process right to refuse the COVID-19 vaccine. Plaintiff also fails plausibly to plead fraudulent concealment or conspiracy to deprive him of his civil rights in violation of § 1985(3). And, because all of Plaintiff's individual claims must be dismissed, his putative class claims must be dismissed as well.

The Court will also deny Plaintiff's request to file a third amended complaint because filing the amended complaint would be futile. Plaintiff's proposed amended complaint does not cure any of the defects in his second amended complaint. And, although Plaintiff proposes to add two other union defendants he alleges owed him a duty of fair representation, amending his complaint to bring these claims against those unions would be futile because any such claims would be time-barred.

Finally, the Court will deny TCU/IAM's motion for sanctions. Although counsel's litigation conduct is troubling and reflects fundamental misunderstandings of law and lack of care, the Court concludes that the record is insufficient to demonstrate that counsel's refusal to dismiss TCU/IAM constitutes intentional harassment or crosses the line from ill-advised to sanctionable conduct. The Court cautions Plaintiff's counsel, however, that repeated attempts to pursue claims against concededly improper defendants—and to contrive novel and unsupported

justifications for doing so after the fact—frustrates the judicial process and will invite sanctions if, after fair warning, counsel continues to press such claims.

**A. TCU/IAM's Motion to Dismiss**

At the outset, TCU/IAM argues that Plaintiff lacks standing to bring his claims against it because all of Plaintiff's claims relating to TCU/IAM's alleged actions are, in substance, claims for breach of the duty fair representation under the Railway Labor Act and must be treated as such. Plaintiff lacks standing to pursue those claims, TCU/IAM continues, because he was not a member of TCU/IAM; rather, Plaintiff concedes that he was a member of different union, which he now seeks to add as defendant.

TCU/IAM frames its argument as a factual challenge to the Court's jurisdiction under Rule 12(b)(1), which the Court must resolve not by accepting Plaintiff's factual allegations as true but, instead, by considering the relevant jurisdictional fact—here, whether Plaintiff was a member of TCU/IAM or a different union. *See Phoenix Consulting, Inc.*, 216 F.3d at 40. TCU/IAM further argues that, because it moves to dismiss for lack of Article III jurisdiction, the Court may consider materials outside the pleadings, including any undisputed facts established in the record. *All. For Democracy v. FEC*, 362 F. Supp. 2d 138, 142 (D.D.C. 2005); *Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 294 (D.D.C. 2018) (citations omitted).

The requirement that a plaintiff establish his standing stems from Article III's requirement that federal courts decide only "Cases" and "Controversies." *See Lujan*, 504 U.S. at 560. The inquiry requires a plaintiff to establish three elements: (1) that he has suffered an "injury in fact," (2) "that the injury is 'fairly traceable' to the challenged action of the defendant," and (3) that his injury will likely be "redressed by a favorable decision" of the Court. *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012) (quoting *Lujan*, 504 U.S. at

560–61). "Standing must be demonstrated for each claim against each defendant." *Bodude v. U.S. Dep't of State*, No. 25-cv-193, 2026 WL 1983309, at *2 (D.D.C. July 8, 2026) (citation modified).

Suing the wrong defendant implicates the second prong of the standing analysis, traceability. Here, no party disputes that Plaintiff was terminated from his employment at Amtrak and that the termination constitutes an injury-in-fact for purposes of Article III. But, if TCU/IAM was not Plaintiff's union, and therefore owed him no duty of fair representation (or any other alleged duty), Plaintiff cannot establish that his alleged injury was "caused by" TCU/IAM. *Bodude*, 2026 WL 1983309, at *2 (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007)). The duty of fair representation under the Railway Labor Act runs from a representative union only to those it represents, *i.e.*, "members of its collective-bargaining unit," *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 376 n.22 (1984), and the duty is "coextensive with [a union's] statutory authority to act as the exclusive representative for all the employees within the unit," *id.*; *see also Allied Chem. & Alkali Workers of Am., Loc. Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 181 n.20 (1971) (explaining that the duty of fair representation "does not require a union affirmatively to represent non-bargaining unit members or to take into account their interests" when representing its members). It follows that Plaintiff's injuries from his union's alleged breach of its duty by failing to advocate against Amtrak's COVID-19 policy would not be traceable to the conduct of a different union, which did not represent him and thus did not owe him a duty of any kind. *Cf. Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821 (9th Cir. 1985) ("Because the union owed no duty to Karo as a nonemployee of the bargaining unit, he lacks standing to sue for breach of such a duty."); *Souter v. Int'l Union, United Auto.,*

*Aerospace & Agr. Implement Workers of Am., Loc. 72*, 993 F.2d 595, 597 n.1 (7th Cir. 1993) (concluding that a plaintiff "ha[d] no standing to claim breach of the duty of fair representation, since she was not a member of the collective bargaining unit"). The same holds true, moreover, for Plaintiff's remaining claims against TCU/IAM; if TCU/IAM was not Plaintiff's union, Plaintiff lacks standing to sue *that* union—as opposed to his actual union—for any and all claims alleging that *his* union breached some duty it owed to him by failing to challenge Amtrak's COVID-19 policy through collective bargaining or litigation, *see* Dkt. 10 at 56 (SAC ¶ 243).

Because TCU/IAM's defense—that is, that it was not Plaintiff's union—is best framed as a jurisdictional defense, the Court may resolve factual disputes, even at this early stage of the litigation. But, as explained below, the Court need not do so, because the essential facts are reflected in Plaintiff's own filings and, in any event, are undisputed. Plaintiff's second amended complaint, to be sure, does allege that TCU/IAM was the union that represented him. *See* Dkt. 10 at 13, 38, 39, 42 (SAC ¶¶ 16(a), 138, 146, 165). But at least one exhibit attached to (and incorporated into) that complaint makes TCU/IAM's point: Exhibit 20, an unsigned offer of reinstatement from Amtrak, lists "ASWC-UNITE HERE" as Plaintiff's union. *See* Dkt. 10-2 at 2–3 (SAC, Ex. 20 at 1–2). Similarly, Exhibit 24 to Plaintiff's second amended complaint, Amtrak's July 11, 2022, decision following Plaintiff's disciplinary hearing, notes that Plaintiff was "represented by [his] ASWC union representative Pierre Whittaker," Dkt. 10-2 at 27 (SAC, Ex. 24 at 1), and, in the absence of any dispute, the Court can take judicial notice of the fact that Pierre Whittaker is the Chapter President of UNITE HERE Local 23, *see* Dkt. 21-2 at 11 (TCU/IAM Mot. to Dismiss, Ex. 4). Beyond Plaintiff's own exhibits, moreover, TCU/IAM has proffered further confirmation that TCU/IAM was not Plaintiff's union. The evidence includes an excerpt from the transcript of Plaintiff's disciplinary hearing, in which Plaintiff identifies his

union representative as Pierre Whittaker, Dkt. 21-2 at 9 (TCU/IAM Mot. to Dismiss, Ex. 3 at 2), and screenshots from Amtrak's internal database showing that Plaintiff was listed as a member of HERE and that his dues were deducted for "HERE Local 670," *see* Dkt. 21-2 at 2–3, 5 (TCU/IAM Mot. to Dismiss, Exs. 1 & 2). Plaintiff does not dispute any of this evidence.

Ultimately, however, the Court need not rely on this uncontroverted evidence because Plaintiff concedes that he named the wrong union in his second amended complaint. He seeks leave "to add UnitedHere [sic] as a new defendant based on [his] inadvertent incorrect identification of TCU/IAM as his union when UnitedHere [sic] was actual the union to whom he paid his dues." Dkt. 26 at 2. As he explains, he "seeks leave to amend the complaint to add *the correct* union Unite Here." Dkt. 36 at 26 (emphasis added). Plaintiff was represented by counsel when he made this concession, and he, accordingly, should be held to it. It follows that any breach of duty of fair representation is not fairly traceable to anything that TCU/IAM did—or did not do.

Rather than defend the allegation that forms the basis for his existing claims against TCU/IAM—that is, that TCU/IAM "was the union representing Plaintiff at the time of the events outlined" in the second amended complaint, Dkt. 10 at 13 (SAC ¶ 16(a)); *see also id.* at 38–39 (SAC ¶¶ 138, 146)—Plaintiff shifts gears and raises two new arguments, neither of which withstands scrutiny. He first argues that the Court should not dismiss his claims against TCU/IAM "because Plaintiff's complaint includes a claim for class certification wherein Plaintiff serves as class representative for similarly situated parties who have standing to assert the same claims against TCU/IAM." Dkt. 26 at 2. But Supreme Court precedent establishes that a plaintiff who is not a member of the class that he purports to represent is not a proper representative for such claims. *See E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395,

403–04 (1977). Plaintiff concedes that he is not a member of the class of Amtrak employees represented by TCU/IAM who were allegedly harmed by its representation with respect to Amtrak's COVID-19 policy. And his lack of standing to bring individual claims against TCU/IAM prevents him from bringing those same claims against TCU/IAM on behalf of additional class members. *See Hamburger v. Carefirst Bluecross Blueshield*, 838 F.Supp.3d 32, 41 (D.D.C. 2026) (collecting cases).

Second, Plaintiff asserts in his opposition brief "that TCU/IAM was a signatory labor organization to the collective bargaining agreement governing Amtrak On-Board Service employees and participated in the negotiation, administrative, and enforcement of employment conditions affecting Plaintiff," Dkt. 36 at 25, and "that labor organizations may owe duties to employees affected by their bargain authority or concerted action, even where formal membership status is disputed," *id.* at 26. Here, however, Plaintiff's "membership status is [not] disputed;" he concedes that he was not a member of TCU/IAM. Nor does Plaintiff cite any authority for the proposition that a union that is party to a multilateral collective bargaining agreement owes a duty of fair representation to an employee who is a member of a different union, even if that union is party to the same collective bargaining agreement.

Plaintiff's argument evolves further in his reply in support of his motion for leave to file a third amended complaint, where he hints at the possibility that ASWC may have acted as "the collective bargaining representative" for each of the unions and may have "delegated" representational duties to the "constituent unions." *See* Dkt. 47 at 3 (suggesting that factual questions remain about whether ASWC, TCU/IAM, and/or UNITE HERE "owed Plaintiff representational duties during the events giving rise to this action"). Plaintiff appears to concede, however, that he currently lacks an evidentiary basis to support that contention at this point;

instead, he requests jurisdictional discovery on that question. *See id.* at 2–3 (requesting that "Defendants produce any constitution, bylaws, joint operating agreement, side agreement, memorandum of understanding, or other governance documents allocating representational duties among the ASWC, TCU/IAM and UNITE HERE"). And, even if Plaintiff's request for discovery were properly presented in a reply in support of a different motion, the Court would deny the request because "jurisdictional discovery is not a fishing expedition" and thus "cannot be granted based on nothing more than conjecture or speculation as to whether jurisdictionally relevant information would be uncovered." *Gligorov v. Nation of Brunei*, 185 F.4th 1169, 1184 (D.C. Cir. 2026) (citation modified). Here, Plaintiff has not identified any specific disputed facts that he believes these documents would likely reveal about TCU/IAM's duties of representation.

But even putting all of these difficulties aside, Plaintiff's evolving arguments for bringing suit against TCU/IAM suffer from an unavoidable and dispositive problem: they bear no relation to the allegations contained in Plaintiff's second amended complaint or to his standing to pursue *those* claims. The Court will therefore dismiss Plaintiff's DFR claim against TCU/IAM under Rule 12(b)(1) for lack of standing.

In addition to his DFR claim, Plaintiff's second amended complaint asserts claims against TCU/IAM for fraudulent concealment under D.C. law and for conspiracy to deprive Plaintiff of his civil rights under 42 U.S.C. § 1985(3). The complaint is less clear about whether Plaintiff also intends to bring his claim for wrongful discharge under the OSHA Act against TCU/IAM, but, for present purposes the Court can assume that he does. In response, TCU/IAM contends that Plaintiff lacks standing to sue TCU/IAM on these claims as well because they merely repackage his DFR claim under a different label, and, when understood in this light, they suffer

from the same flaw that dooms his DFR claim: Plaintiff lacks standing to challenge his representation by a union who did not represent him.

The Court agrees that Plaintiff's fraudulent concealment claim must be dismissed as to TCU/IAM because it is, in substance, a repackaging of Plaintiff's DFR claim. When a plaintiff asserts a fair representation claim "along with state claims based on similar conduct, the court must examine whether the state law claims are preempted" by federal labor law. *Williams v. Amalgamated Transit Union Loc. 689*, 245 F. Supp. 3d 129, 134 (D.D.C. 2017), *aff'd*, No. 17-7076, 2017 WL 4217248 (D.C. Cir. Aug. 23, 2017); *see also May v. Shuttle, Inc.*, 129 F.3d 165, 179 (D.C. Cir. 1997) (holding that a state law claim must be dismissed as preempted by the Railway Labor Act's duty of fair representation when the claims are "the same"). Plaintiff's fraudulent concealment claim against TCU/IAM is based on his allegation that TCU/IAM had a duty to disclose to him that he had the right to refuse to comply with Amtrak's COVID-19 policy. *See* Dkt. 10 at 9, 39, 42 49 (SAC ¶¶ 7, 149–50, 169, 201–02). But, if TCU/IAM owed Plaintiff a duty to inform him of any rights, that duty would flow from the duty of fair representation unions owe to their members. Plaintiff's complaint does not aver that TCU/IAM owed him any duty other than that owed by unions to employees under the Railway Labor Act. *See* Dkt. 10 at 38–43 (SAC ¶¶ 138–73).

Plaintiff's claim of conspiracy to deprive him of his civil rights under 42 U.S.C. § 1985(3) poses a slightly more difficult question. Nearly all of the cases that TCU/IAM identifies in which a court has recharacterized claims as DFR claims involve state law claims that the court held were preempted by federal labor law, claims that required the court to interpret the terms of a collective bargaining agreement, or both. *See, e.g.*, *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) ("We do hold that when resolution of a state-law claim is

substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as pre-empted by federal labor-contract law."); *Harris v. Amalgamated Transit Union Loc. 689*, 825 F. Supp. 2d 82, 85–96 (D.D.C. 2011) (holding that state law claims were preempted by the federal statutory duty of fair representation); *Marcus v. Dolan*, No. 8-cv-2181, 2008 WL 3822353, at *2 (D.N.J. Aug. 12, 2008) (same); *Odell v. Kalitta Air, LLC*, 678 F. Supp. 3d 904, 916–17 (E.D. Mich. 2023), *aff'd*, 107 F.4th 523 (6th Cir. 2024) (dismissing federal statutory employment discrimination claims as barred by the Railway Labor Act because they required interpreting a collective bargaining agreement). Because Plaintiff's § 1985(3) claim arises under federal, rather than state, law, the Court cannot conclude that his conspiracy claim is preempted by the Railway Labor Act as a state common-law conspiracy claim might be. Nor does Plaintiff's claim invoke any contract governed by federal labor contract law or require interpretation of a collective bargaining agreement.

For support, TCU/IAM cites cases where other federal courts have treated federal claims premised on a union's deficient representation as DFR claims. *See Garland v. US Airways, Inc.*, No. 5-cv-140, 2006 WL 3692591, at *7 (W.D. Pa. Dec. 12, 2006) ("The [union] Defendants argue that, as to them, Plaintiff's remaining federal claims are merely restatements of his federal DFR claim under different headings. For the most part, I agree. As set forth above, Plaintiff cannot avoid dismissal of his DFR claim simply by repackaging that claim under the guise of a different cause of action."); *Seitz v. Int'l Bhd. of Teamsters*, No. 23-cv-01716, 2023 WL 6883358, at *6 (N.D. Cal. Oct. 17, 2023) (explaining that, even with respect to federal claims that are not preempted by federal labor law, "there is some logic to the notion that a fair-representation claim that is simply given a different label should be treated by the court as a fair-

representation claim"). Here, Plaintiff's only basis for alleging that TCU/IAM participated in a conspiracy is that it violated its duty of fair representation by failing to oppose Amtrak's COVID-19 policy, *see* Dkt. 10 at 61–62 (SAC ¶¶ 268–74) (contending that TCU/IAM's alleged breach of duty constituted "tacit agreement, material assistance, and overt participation" in the alleged conspiracy), so his § 1985(3) claim is no different from his claim that TCU/IAM violated the DFR. It follows that Plaintiff's § 1985(3) claim should fail for the same reason that his DFR claim fails. He names the wrong union, and thus any injury resulting from an alleged violation of *his* union's breach of its duty of fair representation is not traceable to TCU/IAM's failure to represent him.

Plaintiff's remaining claims against TCU/IAM suffer from the same problem. To the extent that Plaintiff intends to bring his wrongful discharge claim against TCU/IAM in addition to Amtrak, that claim must also be dismissed for lack of standing because Plaintiff's complaint alleges that he was employed by Amtrak and discharged by Amtrak, rather than by TCU/IAM. Just as TCU/IAM is the wrong defendant for Plaintiff's DFR claim because it was not his union, it is also the wrong defendant for Plaintiff's wrongful discharge claim because the union was not his employer. And, to the extent Plaintiff intends to bring a claim against TCU/IAM for allegedly violating the OSHA Act by failing to oppose Amtrak's COVID-19 policy or adequately represent Plaintiff in his disciplinary hearing, that claim is no different in substance from Plaintiff's DFR claim and must be treated as such. Plaintiff thus lacks standing to assert his wrongful discharge claim against TCU/IAM, which, on the undisputed record, neither represented nor fired him. Once again, his alleged injuries are not fairly traceable to anything that TCU/IAM did or failed to do.

Finally, the Court notes that the D.C. Circuit has yet to decide whether the failure to name the correct union in a DFR case is best addressed as a question of Article III jurisdiction or on the merits. For the reasons explained above, the Court is persuaded that Plaintiff's alleged injuries are not traceable to anything that TCU/IAM did (or did not do) and that, accordingly, the Court is without jurisdiction to consider Plaintiff's claims against TCU/IAM. But because the questions of standing and the merits are so closely intertwined, and because the law is unsettled in this circuit, the Court goes on to note that it would, in any event, reach precisely the same conclusion on the merits. Plaintiff cannot possibly recover from a union that he concedes did not represent him and that therefore owed him no duty of fair representation for any claim premised the breach of that nonexistent duty.[3] Thus, whether framed as a jurisdictional or merits defense, Plaintiff's claims against TCU/IAM cannot stand.

The Court will, accordingly, grant TCU/IAM's motion to dismiss in its entirety for lack of Article III jurisdiction or, in the alternative, for failure to state a claim upon which relief can granted.

### B. Claims Against Former President Biden

Plaintiff also brings claims against former President Joe Biden for his issuance of Executive Order 14042 and related guidance, his public statements during his presidency about COVID-19 and vaccines, and his alleged participation in a conspiracy to deprive Plaintiff of his civil rights by "solicit[ing] Defendants Amtrak and TCU/IM [sic] to share Biden's and the Pope[']s unconstitutional objective of depriving Plaintiffs of their OSHA Act protected right to refuse the Covid-19 vaccine." Dkt. 10 at 58 (SAC ¶ 254). In addition to contending that the

---

[3] To the extent it is necessary for the Court to treat TCU/IAM's motion to dismiss as an uncontroverted (and, effectively, conceded) motion for summary judgment to this limited extent, the Court will do so. *See* Fed. R. Civ. P. 12(d).

Executive Order and related guidance violated the OSHA Act and the separation of powers, *see* Dkt. 10 at 58, 65 (SAC ¶¶ 254, 290–93), Plaintiff alleges that several of President Biden's public statements about the COVID-19 vaccine violated the Establishment Clause of the First Amendment by "invoke[ing] papal moral authority in support of COVID-19 vaccination" and thus "elevat[ing] the Catholic religious moral doctrine above all other faith practices that include refusing the Covid-19 vaccine," Dkt. 10 at 59 (SAC ¶¶ 258–59). Plaintiff seeks money damages against President Biden only in his individual capacity, *see* Dkt. 10 at 7 (SAC ¶ 1), but also asserts equitable constitutional and *ultra vires* claims for declaratory and injunctive relief, *see id.* at 64–66 (SAC ¶¶ 286–98). Plaintiff's later-filed notice of clarification asserts that he intended to assert his claims for declaratory and injunctive relief against former President Biden in his official capacity. *See* Dkt. 42 at 1.

Although declaratory and injunctive relief are remedies rather than causes of action, *see Miriyeva v. U.S. Citizenship & Immigr. Servs.*, 9 F.4th 935, 945 (D.C. Cir. 2021); *Webb v. Off. of Mgmt. & Budget*, No. 23-cv-00816, 2025 WL 958129, at *5 (D.D.C. Mar. 31, 2025), *aff'd*, No. 25-5127, 2026 WL 1179415 (D.C. Cir. Apr. 28, 2026), because the Court is required to construe Plaintiff's *pro se* complaint liberally, the Court will assume that Plaintiff intends to assert implied constitutional and *ultra vires* causes of action. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). The Court thus understands Plaintiff's second amended complaint to challenge President Biden's Executive Order 14042, related COVID-19 vaccine guidance, and identified public statements as *ultra vires* and in violation of the separation of powers and the Establishment Clause. The Court further understands Plaintiff to seek a declaratory judgment that these actions were unlawful and an injunction against future actions to reissue, enforce, or implement these actions. *See* Dkt. 10 at 66 (SAC ¶¶ 297–98).

Plaintiff is far from clear about which, if any, additional claims he intends to bring against President Biden and in what capacity he intends to assert any such claims. Plaintiff's wrongful discharge and fraudulent concealment claims appear to be directed against Amtrak alone, although his second amended complaint fails to specify which defendants he intends to name in those counts. The complaint does specify that Plaintiff's *Bivens* claim is asserted against Amtrak alone, but his opposition to Amtrak and TCU/IAM's motions to dismiss argues that *Bivens* supports a damages claim against President Biden for his allegedly unconstitutional and *ultra vires* actions. *See* Dkt. 36 at 12. Because Plaintiff's second amended complaint was filed *pro se*, the Court will assume—at least for present purposes—that he intends to assert a *Bivens* claim against President Biden. *See Bestor v. FBI*, 539 F. Supp. 2d 324, 330 (D.D.C. 2008) ("The court is permitted to liberally construe the pleadings of a *pro se* plaintiff and to consider supplemental materials filed by a *pro se* litigant to clarify the claims presented."). Finally, Plaintiff does bring his § 1985(3) conspiracy claim against President Biden.

So construed, the Court has before it *Bivens* and § 1985(3) claims against President Biden in his individual capacity seeking money damages and constitutional and *ultra vires* claims for declaratory and injunctive relief against President Biden in his official capacity.[4] Both sets of claims fail. With respect to Plaintiff's individual-capacity damages claims, President Biden is absolutely immune from liability because the allegedly unlawful acts fall within the scope of his official responsibility as President. And Plaintiff's remaining claims on which he seeks declaratory and injunctive relief have been rendered moot by the recission of the challenged

[4] To the extent Plaintiff seeks money damages against former President Biden in his official capacity, sovereign immunity bars any such claim. *Clark v. Libr. of Cong.*, 750 F.2d 89, 103 (D.C. Cir. 1984) ("Sovereign immunity, however, does bar suits for money damages against officials in their *official* capacity absent a specific waiver by the government.").

Executive Order and related guidance and the lack of any reason to believe that a similar Executive Order or guidance is forthcoming, much less that it would affect Plaintiff's employment.[5] *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

1. *President Biden's Absolute Immunity from Civil Liability*

It is a long-established rule that a former President of the United States "is entitled to absolute immunity from damages liability predicated on his official acts." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). These acts include all acts a President takes pursuant to "constitutional and statutory authority" in the course of performing the functions of his office. *Trump v. United States*, 603 U.S. 593, 617 (2024) (citation modified). But immunity does not apply only when a President acts pursuant to a specific constitutional or statutory mandate. Given "the breadth of the President's discretionary responsibilities," including in "a broad variety of areas, many of them highly sensitive," the Supreme Court has recognized that presidential immunity "extends to the outer perimeter of the President's official responsibilities." *Id.* at 617–18 (citation modified); *see also Fitzgerald*, 457 U.S. at 756. That is, a former President is immune from liability for money damages if the challenged act is "the kind of act not manifestly or palpably beyond [the official's] authority, but rather having more or less connection with the general matters committed by law to his control or supervision." *Blassingame v. Trump*, 87 F.4th 1, 13 (D.C. Cir. 2023) (citation modified); *Trump*, 603 U.S. at 618. In drawing lines between official acts and ones beyond the outer perimeter of official

[5] The Court may dismiss *sua sponte* any of Plaintiff's claims from which President Biden is absolutely immune because, when immunity bars the suit, Plaintiff "cannot possibly win relief." *Baker*, 916 F.2d at 726. The Court may also consider on its own initiative whether Plaintiff's claims for prospective relief are moot because, as with all jurisdictional defects, the Court is obligated to dismiss the case if it determines that it lacks jurisdiction to proceed. *Howell ex rel. D.H. v. District of Columbia*, 522 F. Supp. 2d 57, 62 n.2 (D.D.C. 2007).

responsibility, the Supreme Court has instructed that "courts may not inquire into the President's motives," *Trump*, 603 U.S. at 618, "[n]or may courts deem an action unofficial merely because it allegedly violates a generally applicable law," *id.* at 619.

Undoubtedly, President Biden's issuance of Executive Order 14042 and related COVID-19 guidance are the kinds of official acts that cannot support a claim for monetary liability. Issuing an executive order addressing an international public health crisis, and providing guidance regarding the implementation of that executive order, lie at the core of the President's official duties. *See Trump*, 603 U.S. at 622 ("The President and Vice President together are the senior officials of the Executive Branch of government and therefore must formulate, explain, advocate, and defend policies of the President's administration." (citation modified)); *cf. Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 225 (D.D.C. 2020) (treating an executive order as an exercise of the President's official duties) (citing *Mississippi v. Johnson*, 71 U.S. 475, 498–99) (1866)). President Biden is therefore immune from any monetary claims based on his issuance or implementation of Executive Order 14042 and the related guidance.

With respect to President Biden's public statements about the COVID-19 vaccine, the scope of his immunity depends on the context of his statements and the capacity in which he made them. *See Blassingame*, 87 F.4th at 15–16. Although not expressly provided by any constitutional or statutory provision, a President's speech "to and on behalf of the American people" can constitute an "official" act, "even when not obviously connected to a particular constitutional or statutory provision." *Trump*, 603 U.S. at 618 (citation modified). "Indeed, a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." *Id.* at 629. Accordingly, "most of a President's public

communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Id.* To be sure, "[t]here may . . . be contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity—perhaps as a candidate or party leader." *Id.* The President is not immune in all respects—or, indeed, in any unofficial capacity—merely because he is President. But courts must endeavor to draw the line between official and unofficial conduct based on an "objective analysis of 'content, form, and context.'" *Id.* (citation omitted).

Applying that "objective analysis" here, the Court concludes that Plaintiff's allegations involve exclusively statements made in President Biden's official capacity. Plaintiff's complaint repeatedly challenges President Biden's "official statements" on COVID-19 vaccines, including his public remarks about the Executive Branch's policies regarding the pandemic, which, as reflected in Plaintiff's attachments to his complaint, were posted to the official White House website. *See* Dkt. 10 at 32–33 (SAC ¶¶ 114, 116, 118) (challenging "multiple official statements" and "[o]fficial presidential remarks"); Dkt. 10-2 at 33–37 (SAC, Ex. 26) (remarks by President Biden on the COVID-19 pandemic posted to the official White House website). Plaintiff also challenges certain remarks President Biden made during an Easter holiday video on April 4, 2021, which referenced public statements by Pope Francis encouraging vaccination.[6] *See* Dkt. 10 at 33 (SAC ¶ 120); Dkt. 10-2 at 40–41 (SAC, Ex. 27) (news report on President Biden's April 4, 2021, Easter video). Finally, Plaintiff challenges a public statement by President Biden, posted on the White House website, which addresses the Supreme Court's

[6] Pursuant to Federal Rule of Civil Procedure 201, the Court takes judicial notice of the fact that the Easter video Plaintiff references was posted to President Biden's official account on the social media platform X and ended with a logo attributing the video to the White House. *See* Fed. R. Civ. P. 201(b)(2), (c); President Biden Archived (@POTUS46Archive), *X* (Apr. 4, 2021, 10:30 AM), https://perma.cc/VZ25-LJEP.

decision on a Biden administration policy on workplace vaccine requirements. Dkt. 10 at 37 (SAC ¶ 133); Dkt. 10-2 at 203 (SAC, Ex. 42) (Statement by President Joe Biden on the U.S. Supreme Court's Decision on Vaccine Requirements).

All of these statements—which were made during President Biden's tenure in office, communicated through official White House channels, directed to the American public, and related to issues of public health and national policy—were undertaken in President Biden's official capacity. Nothing in the "content, form, or context" of those statements even hints at some unofficial capacity. President was not, for example, speaking as a spokesperson for the vaccine manufacturers or as a candidate for office. He was addressing an issue of profound national importance, during a time of crisis, and in his capacity as the Chief Executive of the United States.

Finally, the factual allegations on which Plaintiff's § 1985(3) claim is based—and any of the factual allegations contained in the complaint upon which any OSHA Act and fraudulent concealment claim could be based—involve only President Biden's official acts in issuing Executive Order 14042 and the related guidance and in making official statements about the COVID-19 vaccine. Plaintiff alleges no additional facts that might plausibly raise an inference that President Biden joined a "conspiracy" to violate Plaintiff's rights in some unofficial capacity. Plaintiff may disagree on policy grounds with the decisions that President Biden made, but that is precisely the type of disagreement that absolute presidential immunity screens from the chilling effect of private suits for damages.

The Court will, accordingly, dismiss all of Plaintiff's claims seeking damages against President Biden on grounds of absolute presidential immunity.

2. *Mootness of Claims for Declaratory and Injunctive Relief*

Turning to Plaintiff's remaining constitutional and *ultra vires* claims, the Court concludes that these claims must be dismissed because the rescission of the challenged Executive Order and related guidance has rendered those claims moot. Article III of the Constitution limits the federal courts to deciding only "actual, ongoing controversies." *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1127 (D.C. Cir. 2024) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). The mootness doctrine thus requires a federal court to "refrain from deciding the dispute if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Id.* (citation modified). When the government rescinds a challenged policy, the D.C. Circuit has often held that challenges to that policy are "classically moot for lack of a live controversy." *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016); *Samma v. Dep't of Def.*, 136 F.4th 1108, 1113–14 (D.C. Cir. 2025); *Larsen v. U.S. Navy*, 525 F.3d 1, 4–5 (D.C. Cir. 2008). Here, there is no dispute that President Biden rescinded the challenged Executive Order and the associated guidance; Plaintiff's complaint itself alleges that the rescission occurred years ago. Dkt. 10 at 30 (SAC ¶ 99). Plaintiff's claims challenging the lawfulness of President Biden's Executive Order and COVID-19 vaccine guidance are thus "classically moot." *Akiachak Native Cmty.*, 827 F.3d at 106.

In apparent recognition of the mootness of any claim seeking relief respecting the now-rescinded Executive Order and guidance, Plaintiff seeks a declaratory judgment and injunction against future attempts to adopt or implement either the rescinded policies or similar future ones. *See* Dkt. 10 at 66 (SAC ¶¶ 297–98). In his view, such relief is necessary because "there exists a cognizable danger of recurrence of the same unconstitutional and unlawful conduct during future declared emergencies." *Id.* at 37 (SAC ¶ 137). To be sure, the Supreme Court and the D.C.

Circuit have recognized certain exceptions to the mootness doctrine when challenged conduct that has ceased is *likely* to recur. *See Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (capable-of-repetition-yet-evading-review exception); *FBI v. Fikre*, 601 U.S. 234, 241–42 (2024) (voluntary-cessation exception). But those exceptions require far more than a chance that some future pandemic or other public health crisis might prompt a future president to take a similar action, which might apply to Plaintiff's then-current employer in a manner that might lack an exception sufficient to protect Plaintiff's asserted rights. *See Samma*, 136 F.4th at 1114; *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 188 F.4th 400, 406–407 (D.C. Cir. 2026). Plaintiff's conclusory allegation that "[n]ational public-health emergencies recur," Dkt. 10 at 37 (SAC ¶ 137), is insufficient to permit the Court to adjudicate the lawfulness of some hypothetical future government action, which, in order for the Court to grant forward-looking relief on an otherwise-moot claim, must affect Plaintiff "in the same fundamental way" as Executive Order 14042 allegedly affected him, *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 362 (D.C. Cir. 2018) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993)). The Court will not "speculate on the form of and content of some uncertain future policy" and, based on that speculation, "render an advisory opinion" regarding events and actions that are, at best, highly uncertain. *Samma*, 136 F.4th at 1114. In short, this is "precisely the scenario that the mootness doctrine is intended to avoid." *Id.*

The Court will therefore dismiss as moot Plaintiff's official-capacity claims against President Biden.

**C. Amtrak's Motion to Dismiss**

1. *Wrongful Discharge Claim*

The Court turns to Plaintiff's claims against Amtrak, beginning with his claim for allegedly terminating his employment in violation of the OSHA Act. Although less than clear, Plaintiff's second amended complaint appears to aver that Amtrak's COVID-19 policy violated the OSHA Act in multiple respects. First, he argues that the OSHA Act authorizes only OSHA to set minimum safety standards for employers and alleges that "vaccines are not an OSHA authorized safety method capable of preventing the transmission of any infections disease recognized in the workplace." Dkt. 10 at 7–8 (SAC ¶ 3(b)); *see also id.* at 18–19 (SAC ¶¶ 35–45) (allegations about COVID-19, vaccines, and OSHA's standards regarding COVID-19 safety and vaccination); *id.* at 43–44 (SAC ¶¶ 176–77) (alleging that Amtrak knew that it was mandated by the OSHA Act "to comply with OSHA authorized and approved workplace safety standards" and that Amtrak's COVID-19 policy "conflicted with the OSHA minimum standards"). Second, Plaintiff alleges that Amtrak violated his "Medical Freedom Rights" under the OSHA Act by discharging him for refusing to comply with a vaccine and testing policy that conflicted with his religious beliefs. *Id.* at 45 (SAC ¶¶ 183). Both of these contentions fail as a matter of law because the OSHA Act does not provide a private right of action.

a. <u>Violation of OSHA Health and Safety Standards</u>

The Court begins with Plaintiff's contention that Amtrak violated OSHA's health and safety standards by requiring COVID-19 vaccination and testing, even though neither method of promoting workplace health and safety received OSHA approval. The OSHA Act establishes the following administrative scheme for enforcing OSHA's occupational health and safety standards: First, the Secretary of Labor, acting through OSHA, may investigate and cite employers who fail to comply with minimum safety standards. *See* 29 U.S.C. §§ 657, 658. Second, employees who

believe that their employer has violated a health or safety standard may participate in this process by notifying OSHA of the violation and requesting an inspection, and employees may authorize a representative to accompany and assist OSHA officials during any physical inspection. *Id.* § 657(e), (f)(1)–(2). Third, when employers contest these citations, they may seek a hearing from the Commission. *Id.* § 659(c). Finally, "any person" who is "adversely affected or aggrieved" by the Commission's final decision on the citation may seek judicial review in a United States court of appeals by filing a petition for review. *Id.* § 660(a); *see also id.* § 660(b) (authorizing the Secretary of Labor to obtain review or enforcement of any final order of the Commission).

Nothing in the OSHA Act authorizes an employee who believes that his or her employer is violating minimum health and safety standards to bypass this administrative enforcement process and to bring a civil action in federal district court. Binding precedent from the D.C. Circuit establishes as much: the OSHA Act does not authorize employees to assert a private cause of action against their employers for violating OSHA's health and safety standards. *Am. Fed'n of Gov't Emps., AFL-CIO v. Rumsfeld*, 321 F.3d 139, 143 (D.C. Cir. 2003) ("[I]t is now well established that OSHA violations do not themselves constitute a private cause of action for breach." (citation modified)); *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1235 (D.C. Cir. 1980) ("Section 4(b)(4) [of the OSHA Act] bars workers from asserting a private cause of action against employers under OSHA standards."). To the extent Plaintiff seeks to recover against Amtrak for its enforcement of a COVID-19 vaccination and testing policy that allegedly failed to comply with OSHA's health and safety standards, Plaintiff lacks a cause of action to do so.

b. Wrongful Discharge in Violation of 29 U.S.C. § 660(c)(1)

Plaintiff separately alleges that Amtrak's termination of his employment violated the OSHA Act because Amtrak discriminated against him because of his religion. On Plaintiff's interpretation, the OSHA Act both confers on employees a right to refuse medical testing or immunization if they object on religious grounds, and prohibits employers from discharging employees for exercising this right. Dkt. 36 at 7. Plaintiff locates his asserted right to refuse the COVID-19 vaccine and testing policy in 29 U.S.C. § 669(a)(5), which provides: "Nothing in this or any other provision of this chapter shall be deemed to authorize or require medical examination, immunization, or treatment for those who object thereto on religious grounds, except where such is necessary for the protection of the health or safety of others." 29 U.S.C. § 669(a)(5). Plaintiff contends that his discharge for refusing to comply with Amtrak's vaccination or testing policy (*i.e.*, for exercising this right) violated the OSHA Act's prohibition on discriminating against an employee "because of the exercise by such employee on behalf of himself or others of any right afforded by" the Act. *Id.* § 660(c)(1).

The Court need not decide whether § 669(a)(5) confers a freestanding right to refuse to comply with an employer's vaccination or testing policy, although the Court notes that the sentence from which Plaintiff derives his purported right appears in a provision discussing the authority of HHS to conduct research on toxic substances and includes the caveat that medical examination or immunization may be authorized and required when "necessary for the protection of the health or safety of others." *Id.* § 669(a)(5). Whether or not § 669(a)(5) confers such a right, Plaintiff cannot prevail because he lacks a cause of action to sue Amtrak for termination based on that right. Under binding precedent, § 660(c) authorizes only the Secretary of Labor to bring such claims in federal court.

In *Johnson v. Interstate Management Company, LLC*, the D.C. Circuit held that § 660(c)(2) does not contain a private right of action for employees to sue their employer for allegedly retaliating against them for filing an OSHA complaint or exercising a right under the OSHA Act. 849 F.3d 1093, 1096 (D.C. Cir. 2017). As with Plaintiff here, the plaintiff in *Johnson* sought to enforce § 660(c)(1)'s prohibition on discharging or discriminating against an employee who has filed a complaint or exercised his rights under the OSHA Act. *Id.* Recognizing that § 660(c) contained no express private right of action for such claims, the court in *Johnson* considered whether the OSHA Act contained an implied private right of action—and held that it did not. *Id.* at 1097. As the court explained, "[t]he text of [§ 660(c)] specifically addresses who may sue," and it "grants such authority to the Secretary of Labor, not to private parties." *Id.* at 1098.

*Johnson* applies here and forecloses Plaintiff's claim. Plaintiff asserts a violation of the same provision of the OSHA Act—§ 660(c)(1)'s prohibition on retaliatory discharges—and asks the Court to infer a private right of action from the same provision *Johnson* held did not contain one. It makes no difference that Plaintiff claims that his discharge was in retaliation for asserting his right to object to vaccination on religious grounds rather than for pursuing his right to complain of a safety violation. Section 660(c) applies to both types of retaliation (to the extent it addresses religion-based retaliation at all) and provides the exclusive mechanism by which employees like Plaintiff may seek redress: filing a complaint with the Secretary. 29 U.S.C. § 660(c)(2). The OSHA Act does not allow Plaintiff to circumvent its administrative process by coming straight to court, so Plaintiff's wrongful discharge claim fails as a matter of law.

c. <u>Availability of Alternative Causes of Action</u>

Given the Court's obligation to construe Plaintiff's *pro se* complaint liberally, the Court also considers whether Plaintiff has stated a claim based on some other possible cause of action.

But "[e]ven treating the Complaint with the liberality due to pro se litigants, the Court cannot identify a workable alternative cause of action." *Brown v. FAA*, No. 23-cv-2251, 2025 WL 958321, at *11 (D.D.C. Mar. 31, 2025). Plaintiff's allegations might be understood as an attempt to assert a claim under Title VII of the Civil Rights Act of 1964, which creates a private right of action for employees alleging they have suffered employment discrimination on the basis of religion. *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009); 42 U.S.C. §§ 2000e-2(a). But Title VII requires employees who allege that their employers engaged in prohibited discrimination to exhaust administrative remedies before bringing an action in court. *See Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010). Plaintiff does not even hint that he has done so, which may explain why he does not attempt to allege a Title VII claim.

The Court will, accordingly, dismiss Plaintiff's wrongful discharge claim.

2. *Fraudulent Concealment Claim*

Plaintiff's second amended complaint also includes a claim for fraudulent concealment under D.C. law. The elements of such a claim are "(1) a duty on behalf of the defendant to disclose to the plaintiff a material fact; (2) failure to disclose that fact; (3) an intention to defraud or deceive the plaintiff; (4) action taken by the plaintiff in justifiable reliance on the concealment; and (5) damages as a result of the defendant's concealment." *Howard Univ. v. Watkins*, 857 F. Supp. 2d 67, 75 (D.D.C. 2012). Under Federal Rule of Civil Procedure 9(b), a plaintiff asserting a claim of fraud must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The relevant circumstances include the "'time, place, and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud,' as well as the 'identity of the individuals allegedly involved in the fraud.'" *Busby v. Cap. One, N.A.*, 932 F. Supp. 2d 114, 136 (D.D.C. 2013)

(cleaned up) (quoting *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)).

Plaintiff first contends that Amtrak had a duty to disclose the existence of his purported OSHA Act right to refuse vaccination pursuant to an OSHA regulation requiring employers to inform employees of their OSHA rights, including their rights against retaliatory discharge under 29 U.S.C. § 660(c). Dkt. 10 at 49 (SAC ¶ 203) (citing 29 C.F.R. § 1904.35(b)(1)(iii)). Plaintiff alleges that Amtrak never informed him of his right to refuse compliance with the vaccine and testing policy and thus fraudulently concealed that information. *Id.* at 49, 50 (SAC ¶¶ 201, 205–07). Even assuming that Plaintiff's second amended complaint satisfied Rule 9(b)'s heightened pleading standards—and it does not—his fraudulent concealment claim fails because Amtrak owed him no duty to inform him of any OSHA Act right to refuse the COVID-19 vaccine or testing.

Plaintiff relies on OSHA's regulations governing the reporting of "work-related injuries and illnesses" to argue that Amtrak had an affirmative duty to inform him about (1) his "right" to refuse to comply with Amtrak's COVID-19 policy under 29 U.S.C. § 669(a)(5) and (2) his "optional right" to complain of his allegedly discriminatory discharge to OSHA. *Id.* at 49 (SAC ¶ 201). But OSHA's regulations include no such duty. The OSHA regulations governing employers' obligations to inform their employees of their OSHA rights make no mention of an employee's right to refuse an employer's vaccination or testing policy on religious grounds, nor do they impose on employers an obligation to inform employees about their ability to file complaints with the Secretary of Labor or OSHA. Instead, they merely require that employers "inform each employee of how he or she is to report an injury or illness" to the employer, provide employees with information about the employer's procedure for reporting work-related

injuries and illnesses, and "inform each employee" that (i) "[e]mployees have the right to report work-related injuries and illnesses" and (ii) "[e]mployers are prohibited from discharging or in any manner discriminating against employees for reporting work-related injuries or illnesses." 29 C.F.R. § 1904.35(a)(1), (b)(1)(ii), (b)(1)(iii)(A)–(B).

Plaintiff does not allege that Amtrak fraudulently concealed from him any of the information specified in the OSHA regulation, nor has he identified any other source of law imposing on Amtrak a duty to disclose information about filing a wrongful-discharge complaint with OSHA or to disclose information about any rights to refuse vaccination on religious grounds. Absent any such duty, Plaintiff's fraudulent concealment claim cannot survive Amtrak's motion to dismiss.

Plaintiff also fails because, at least with respect to his claim that Amtrak owed him a duty to inform him of his religious freedom rights, the second amended complaint fails to identify "what was retained or given up as a consequence" of the alleged fraud. *Busby*, 932 F. Supp. 2d at 136. According to Plaintiff's complaint, he in fact asserted the right he contends was fraudulently concealed from him: he refused to participate in Amtrak's COVID-19 vaccination or testing policy based on his religious objection.

For all these reasons, Plaintiff has failed to state a fraudulent concealment claim upon which relief can be granted.

3. *Bivens Claim*

Plaintiff next asserts a *Bivens* claim against Amtrak on the grounds that Amtrak's COVID-19 vaccine and testing policy and related termination of his employment violated his constitutional right to refuse unwanted vaccination and testing. *See* Dkt. 10 at 52, 53 (SAC ¶¶ 217–220, 225–26).

At the outset, Plaintiff contends that Amtrak is a federal government actor for constitutional purposes. *See* Dkt. 10 at 52 (SAC ¶¶ 218–19) (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 394 (1995); and *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 55 (2015)). Plaintiff is correct that the Court has held that Amtrak, despite being a for-profit corporation, *see* 49 U.S.C. § 24301(a), "is an agency or instrumentality of the United States for purposes of individual rights guaranteed against the Government by the Constitution," *Lebron*, 513 U.S. at 394; *see also Ass'n of Am. Railroads*, 575 U.S. at 54–55. But neither the Supreme Court nor the D.C. Circuit has ever suggested that Amtrak's unique status as a private entity in some respects and a government entity in others renders Amtrak a "federal agent"—that is, an "individual [federal] official[,]" *Carlson v. Green*, 446 U.S. 14, 20 (1980)—against whom *Bivens* remedies may be sought. For present purposes, however, the Court need not reach that novel argument because, regardless of Amtrak's status, Plaintiff lacks a *Bivens* remedy for a government instrumentality's alleged violation of his purported substantive due process right to refuse COVID-19 vaccination and testing.

In *Bivens*, the Supreme Court allowed an individual to recover against federal officials who violated his Fourth Amendment right against unlawful search and seizure. 403 U.S. at 397. Although no statute provided a cause of action or authorized a damages remedy, the Court inferred a cause of action from the Fourth Amendment itself and held that the plaintiff's demonstration of the Fourth Amendment injury established his entitlement to money damages. *Id.* But *Bivens* does not authorize a plaintiff to seek damages for an alleged constitutional violation of any kind. To date, the Supreme Court has recognized a damages remedy against federal officials for constitutional violations in only three contexts: *Bivens* itself, which involved a claim against agents of the Federal Bureau of Narcotics for an unlawful arrest and search of the

plaintiff's apartment, 403 U.S. at 389, 395, and two others, a claim against a member of Congress for discrimination in violation of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228, 234 (1979), and a claim against prison officials for cruel and unusual punishment in violation of the Eighth Amendment, *Carlson*, 446 U.S. at 17.

The Supreme Court has not extended *Bivens* beyond those three contexts in the nearly fifty years since. Instead, the Court has recently instructed that "recognizing a cause of action under *Bivens* is a disfavored judicial activity." *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (citation modified). In deciding whether to undertake this disfavored recognition of a non-statutory cause of action for damages, the Court must first determine "whether the case presents a new *Bivens* context"—that is, whether the case is "meaningfully different from the three cases" in which the Supreme Court has already recognized *Bivens* remedies. *Id.* at 492. If authorizing a remedy would extend *Bivens* to a new context, the remedy is then unavailable if there are "special factors" counseling against extension, such as if "Congress [] has provided, or authorized the Executive to provide, an alternative remedial structure" or if there is "uncertainty" about the "systemwide consequences" recognizing a new *Bivens* action would produce. *Id.* at 493 (internal quotation marks omitted).

This case presents a "new context" for purposes of the *Bivens* inquiry. "What constitutes a 'new context' is exceedingly broad." *Buchanan v. Barr*, 71 F.4th 1003, 1008 (D.C. Cir. 2023). Meaningful differences that present a "new context" include "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; [and] the statutory or other legal mandate under which the officer was operating." *Ziglar v. Abbasi*, 582 U.S. 120, 140 (2017).

This case presents a new *Bivens* context in at least two respects. First, and most obviously, Plaintiff's claim is premised on a constitutional right not addressed by any of the three Supreme Court cases authorizing a *Bivens* remedy. Plaintiff's second amended complaint asserts a substantive-due-process right to refuse unwanted medical treatment, including the COVID-19 vaccine and tests.[7] Dkt. 10 at 52 (SAC ¶ 220). That Plaintiff's claim would require the Court both to extend *Bivens* to the substantive-due-process context and to recognize a substantive-due-process right to refuse the COVID-19 vaccine (or testing) as a condition of employment renders this case "meaningfully different" from the three cases in which the Court has recognized *Bivens* remedies. *Egbert*, 596 U.S. at 492. Moreover, recognizing a *Bivens* remedy in this case would present an additional new context in that it would require the Court to authorize a remedy not against an individual federal official but rather against Amtrak itself. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71–72 (2001) (declining to extend *Bivens* to allow "a suit against private corporations acting under color of federal law"); *FDIC v. Meyer*, 510 U.S. 471, 484–85 (1994) (declining to recognize a *Bivens* remedy against a federal agency). Recognizing a *Bivens* remedy here would thus require the Court to extend *Bivens* not only to encompass a new constitutional right but also to a "new category of defendants." *Ziglar*, 582 U.S. at 135.

This novelty alone may constitute a "special factor" requiring the Court to hesitate before extending *Bivens* as Plaintiff requests. After all, it would be difficult for the Court to predict the "systemwide" consequences of authorizing a federal damages remedy against corporations like Amtrak for substantive-due-process violations premised on vaccine policies. *Egbert*, 596 U.S. at

[7] Plaintiff also appears to base his *Bivens* claim on his alleged statutory rights under the OSHA Act, *see* Dkt. 10 at 53 (SAC ¶¶ 221–25), but because *Bivens* remedies are implied in the Constitution and thus available only for constitutional violations, *see Ziglar*, 582 U.S. at 132, the Court will disregard such assertions.

493. But another special factor also prevents the Court from expanding *Bivens* to encompass Plaintiff's claim: Congress has already authorized alternative remedial schemes for religious discrimination claims of this sort.

Two statutory schemes arguably provide relief for the types of claims Plaintiff seeks to bring.[8] First, to the extent Plaintiff seeks relief for discharge in violation of the OSHA Act, Congress has provided him an administrative remedy for discriminatory discharge. *See* 29 U.S.C. § 660(c)(2). Employees in Plaintiff's position may obtain relief for wrongful discharge in violation of the OSHA Act by filing a complaint with the Secretary of Labor, who will investigate the alleged violation and may bring a civil action to redress it. *See id.* Second, Plaintiff's claim of religious discrimination would, at least arguably, be cognizable under Title VII of the Civil Rights Act of 1964, which prohibits employment discrimination on the basis of religion and which provides both administrative remedies and a private right of action to remedy violations. *See* 42 U.S.C. §§ 2000e-2(a), 2000e-5(f)(1). True, Plaintiff's ability to take advantage of these alternative remedial schemes may now be limited by his failure to pursue his administrative remedies within the relevant limitations periods. *See* 29 U.S.C. § 660(c)(2) (requiring that a complaint of wrongful discharge in violation of the OSHA Act be filed within 30 days after the violation occurs); 42 U.S.C. § 2000e-5(e)(1) (requiring administrative charges

---

[8] Although the Religious Freedom Restoration Act ("RFRA") authorizes an affected person to bring an action for "appropriate relief against a government" for burdening his or her religious exercise, 42 U.S.C. § 2000bb-1(c), RFRA defines "government" to include agencies, instrumentalities, and officials "of the United States," *id.* § 2000bb-2(1), and Congress has specified that Amtrak "is not a department, agency, or instrumentality of the United States Government," 49 U.S.C. § 24301. Although Congress lacks the authority to define the scope of governmental status for purposes of the Bill of Rights, it undoubtedly has the authority to do so for purposes of the statutes it enacts. *See Lebron*, 513 U.S. at 392 (statutory definition "is assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control"). RFRA thus does not provide Plaintiff a remedy against Amtrak for burdening his religious freedoms.

under Title VII be filed within either 180 or 300 days of the alleged violation). But the availability of alternative mechanisms for protecting the asserted constitutional interests at stake counsels against authorizing a *Bivens* remedy here, even if such relief would be less than that afforded by a *Bivens* remedy and even if Plaintiff himself is now barred from such relief because of his failure timely to assert his rights. *See Bush v. Lucas*, 462 U.S. 367, 378 (1983) (explaining that Congress's creation of alternative remedies, even incomplete ones, counsels against extending *Bivens* to a new context); *Kittner v. Gates*, 783 F. Supp. 2d 170, 174 (D.D.C. 2011) (collecting cases in support of the proposition that Title VII preempts *Bivens* claims for employment discrimination). In fact, Congress's decision to impose time limits on the availability of relief and its requirement that a plaintiff first exhaust his administrative remedies more likely reflects Congress's considered judgment about the circumstances in which a damages remedy should be available for such claims. *Cf. United States v. Fausto*, 484 U.S. 439, 448–49 (1988).

In light of these factors counseling against authorizing a *Bivens* remedy here, the Court concludes that Plaintiff lacks a cause of action under *Bivens* to assert his constitutional claim against Amtrak and that his *Bivens* claim must therefore be dismissed.

4. *§ 1985(3) Conspiracy Claim*

Plaintiff also alleges that Defendants engaged in a conspiracy to deprive him of his civil rights in violation of 42 U.S.C. § 1985(3). Although the Court has already dismissed this claim against TCU/IAM and President Biden, the Court will first consider TCU/IAM's contention that the Court lacks subject-matter jurisdiction over this claim because the allegations of conspiracy are "essentially fictitious," Dkt. 21-1 at 26–27, before addressing Amtrak's contention that the § 1985(3) fails under Rule 12(b)(6), *see* Dkt. 32-1 at 25–27. The Court disagrees with

TCU/IAM that Plaintiff's claim is so devoid of substance as not to present a federal question, but the Court agrees with Amtrak that Plaintiff has nonetheless failed to state a claim.

a. Subject-Matter Jurisdiction

A federal district court may dismiss a claim for lack of subject-matter jurisdiction under Rule 12(b)(1) if the claim "is patently insubstantial," *Neitzke v. Williams*, 490 U.S. 319, 327 n.6 (1989), or "essentially fictitious," *Hagans v. Lavine*, 415 U.S. 528, 537 (1974) (citation modified). The D.C. Circuit has instructed that this doctrine should be reserved for claims in which the factual allegations are "clearly fanciful," such as claims involving "bizarre conspiracy theories, any fantastic government manipulations of their will or mind, [or] any sort of supernatural intervention." *Best v. Kelly*, 39 F.3d 328, 330–31 (D.C. Cir. 1994). Although legal claims might be so insubstantial as to deprive the Court of jurisdiction if "prior decisions inescapably render [them] frivolous," claims that are merely "of doubtful or questionable merit" should instead be reviewed under Rule 12(b)(6)'s standard. *Ord v. District of Columbia*, 587 F.3d 1136, 1144 (D.C. Cir. 2009) (quoting *Hagans*, 415 U.S. at 538); *see also Best*, 39 F.3d at 331 ("If the district court viewed the remaining portion of plaintiffs' complaint as legally frivolous, . . . the proper course would have been to grant the defendant's Rule 12(b)(6) motion.").

Although far-fetched, Plaintiff's conspiracy claim does not involve allegations so fanciful as to warrant dismissal for lack of subject-matter jurisdiction. The factual allegations on which Plaintiff's conspiracy claim is based are that President Biden issued an Executive Order requiring that federal contractors adopt COVID-19 vaccine policies, that Amtrak did in fact adopt a COVID-19 vaccination and testing policy, and that TCU/IAM failed to challenge that policy in breach of its duty of fair representation. *See* Dkt. 10 at 58–62 (SAC ¶¶ 254–74). Even if Plaintiff's conspiracy claim borders on frivolous, his allegations are not as fanciful as "claims

about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel." *Tooley v. Napolitano*, 586 F.3d 1006, 1009 (D.C. Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009) (Souter, J., dissenting)). The Court will, accordingly, review Plaintiff's § 1985(3) claim under Rule 12(b)(6)'s standard.

b. Failure to State a Claim

Even if not based on allegations of the "little green men" variety, Plaintiff's conspiracy claim fails as a matter of law. "An essential element of any conspiracy claim is the existence of some actual conspiracy"—*i.e.*, a "combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an *agreement* between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 74 (D.D.C. 2007) (emphasis in original and citation modified). To survive a Rule 12(b)(6) motion, a plaintiff alleging a conspiracy claim may not simply recite the elements of the cause of action; he must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.

Here, Plaintiff's § 1985(3) conspiracy claim fails because the second amended complaint includes nothing more than conclusory allegations that Defendants formed any agreement to deprive him of his civil rights. The complaint does not allege any facts from which one could plausibly infer that Defendants ever communicated with one another about President Biden's Executive Order or Amtrak's COVID-19 vaccination policy, let alone that they entered into an agreement, tacit or otherwise, to deprive Plaintiff of any rights. *Cf. McManus*, 530 F. Sup. 2d at 75 ("Plaintiffs fail to allege the existence of any events, conversations, or documents indicating that there was ever an agreement or meeting of the minds between any of the defendants to violate Plaintiffs' due process rights or any other civil or constitutional rights." (citation

modified)). Instead of alleging that the parties entered into an agreement of any kind, Plaintiff maintains that President Biden's issuance of the Executive Order constituted a solicitation of the allegedly unlawful COVID-19 vaccination policy, *see* Dkt. 10 at 58 (SAC ¶ 254), and that Amtrak's subsequent issuance of the policy "formed a[] meeting of the minds with Biden" to deprive Plaintiff of his rights, *id.* at 59 (SAC ¶ 261). But an Executive Order requiring government agencies and contractors to comply with certain workplace safety requirements is no more a "conspiracy"—or even an "agreement"—than an act of Congress or an agency regulation imposing any other safety requirements.

Plaintiff's § 1985(3) claim fails for an additional reason. A plaintiff seeking relief under that provision must not only allege that the defendants engaged in a conspiracy but also that the alleged conspiracy "was motivated by some class-based invidiously discriminatory animus." *McManus*, 530 F. Supp. 2d at 75 (citing *United Bhd. of Carpenters and Joiners of Am. v. Scott*, 463 U.S. 825, 835 (1983)). Plaintiff's second amended complaint contains no allegations, conclusory or otherwise, supporting this "essential element." *Id.* Accordingly, even if Plaintiff's complaint contained factual material from which one could infer that Defendants entered into an agreement of some kind, Plaintiff's complaint fails to allege that any such agreement was to deprive Plaintiff of his rights for discriminatory reasons.

5. *Class Allegations*

Plaintiff's second amended complaint also contains class allegations on behalf of other Amtrak employees who "may have been terminated under the same set of facts." Dkt. 10 at 67 (SAC ¶ 305). As Amtrak points out, Plaintiff did not file a motion for class certification within the 90-day period after filing his complaint required by the local rules. *See* L. Civ. R. 23.1(b). And, even if Plaintiff had timely moved for class certification, the dismissal of his individual

claims requires dismissal of his class claims as well. *See Hamburger*, 838 F. Supp. 3d at 41 (collecting cases).

6. *Compliance with Rule 8*

Finally, Amtrak argues that the Court should dismiss Plaintiff's entire second amended complaint with prejudice for failure to comply with Federal Rule of Civil Procedure 8, which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the Court and the adverse parties fair notice of a plaintiff's claims, and, accordingly, it requires that the "[t]he court or opposing party [] be able to understand whether a valid claim is alleged and if so what it is." *Poblete v. Indymac Bank*, 657 F. Supp. 2d 86, 96 (D.D.C. 2009) (citation modified). The "proper length and level of clarity for a pleading . . . is largely a matter that is left for the discretion of the trial court" and varies based on "the nature of the action, the relief sought," and "other pragmatic matters." 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1217 (3d ed. 2004). But decisions in this district have routinely concluded that complaints containing "excessively lengthy recitation of events and myriad seemingly irrelevant descriptions" make it "nearly impossible to discern the essential facts" underlying the plaintiff's legal claims. *Jiggetts v. District of Columbia*, 319 F.R.D. 408, 415 (D.D.C. 2017) *aff'd sub nom. Cooper v. District of Columbia*, No. 17-7021, 2017 WL 5664737 (D.C. Cir. Nov. 1, 2017); *see also T.M. v. District of Columbia*, 961 F. Supp. 2d 169, 175 n.4 (D.D.C. 2013) (collecting cases); *Brown v. Califano*, 75 F.R.D. 497, 499 (D.D.C. 1977) (same).

Plaintiff's second amended complaint is excessively long and unclear. He inconsistently identifies or conflates the bases for his claims and fails to specify which claims he seeks to assert against which defendants. His complaint includes detours into the history of OSHA standards

related to respiratory hazards, *see* Dkt. 10 at 16–17 (SAC ¶¶ 33–33)[9]; theories of how "Plant-Based Lifestyle Medicine or the use of plant foods" can be used as treatment for COVID-19, Dkt. 10 at 20 (SAC ¶ 47); recitations about the Food and Drug Administration's and Center for Disease Control's regulation and guidance on vaccines, Dkt. 10 at 20–21 (SAC ¶¶ 48–51); and descriptions of Pope Francis's public statements on COVID-19 vaccination, Dkt. 10 at 34–36 (SAC ¶ 122–30). Moreover, unwilling to rest on his 211 paragraphs of allegations, Plaintiff attached hundreds of pages of exhibits to his second amended complaint, many of which bear no obvious relevance to his claims. *See, e.g.*, Dkt. 10-1 at 151–53 (SAC, Ex. 11) (out-of-context excerpts of a Department of Labor response to an emergency mandamus petition in the D.C. Circuit); Dkt. 10-1 at 175 (SAC, Ex. 12) (article on the effect of a plant-based diet on inflammation); Dkt. 10-1 at 183–84 (SAC, Ex. 13) (World Health Organization overview of the 2009–2010 Influenza A (H1N1) pandemic); Dkt. 10-2 at 206–07 (SAC, Ex. 43) (publication by the Vatican's Congregation for the Doctrine of the Faith on the morality of COVID-19 vaccines).

Despite these numerous difficulties, the Court is required to hold *pro se* complaints to a less stringent standard than pleadings drafted by lawyers, *see Erickson*, 551 U.S. at 94, and, accordingly, has done its best to parse Plaintiff's claims and to explain why his claims—as the Court understands them—fail as a matter of law. *See T.M*, 961 F. Supp. 2d at 175 ("[D]ismissal under Rule 8 is typically reserved for complaints that are so excessively long as to be unmanageable, or so poorly conceived and drafted that it is difficult to decipher a coherent, viable cause of action."). In doing so, the Court has not addressed each and every passing reference to a statute, constitutional provision, or conceivable cause of action, including

---

[9] Plaintiff's complaint appears to be misnumbered, with multiple paragraphs labeled 32 and 33 on the same page. Here, the Court intends to reference both paragraphs labeled 33 on the same page.

Plaintiff's "musings that extend far beyond the scope of the claims for relief" that he has specified. *Poblete*, 657 F. Supp. 2d at 96. "[B]ald references to sources of relief fall far short of the specificity that Rule 8 requires," *id.*, and Plaintiff's second amended complaint fails to provide sufficient factual allegations for either the Court or Defendants to discern whether Plaintiff intends to press claims for relief beyond those the Court has already discussed. Nor has Plaintiff clarified any such additional claims in his counseled opposition to Defendants' motions to dismiss, *see* Dkt. 36, or in his requests for leave to file a third amended complaint, *see* Dkt. 44, Dkt. 47.

Accordingly, to the extent Plaintiff has attempted to plead claims for relief beyond those the Court has already rejected, the Court concludes that such claims must be dismissed without prejudice for failure to comply with Rule 8. But because Plaintiff filed his second amended complaint before counsel appeared on his behalf, the Court will decline Amtrak's invitation to dismiss the second amended complaint with prejudice. The Court cautions counsel, however, that any further filings in this case must take the analysis set forth above into account and must comply with Rule 11.

**D. Motion to File a Third Amended Complaint**

Having concluded that Plaintiff's second amended complaint must be dismissed without prejudice, the Court considers Plaintiff's request for leave to file a third amended complaint. *See* Dkt. 44. In doing so, the Court considers the most recent version of Plaintiff's proposed third amended complaint, Dkt. 48-1, which Plaintiff filed after TCU/IAM pointed out that the proposed complaint attached to Plaintiff's motion, once again, identified the incorrect union defendant, *see* Dkt. 44 (seeking to add "UNITE HERE Local 43" as a defendant); Dkt. 46 at 1–2 (explaining that Plaintiff is a member of UNITE HERE Local *23* rather than Local *43*). In replying to TCU/IAM's opposition, Plaintiff requested that the Court grant him leave to correct

this error and to add ASWC as a defendant because counsel "recently discovered" a Seventh Circuit decision *from 1993* in which ASWC was named as a defendant in a Railway Labor Act dispute. Dkt. 47 at 2–3. Plaintiff then filed a revised proposed third amended complaint making these changes, *see* Dkt. 48, which the Court will treat as superseding Plaintiff's previously filed proposed third amended complaint. But even in that revised version of Plaintiff's proposed, third amended complaint, he continues to name TCU/IAM as a party, along with UNITE HERE Local 23 and ASWC.

Rule 15(a)(2) instructs that the Court "should freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). But "leave to amend should be denied when amendment would be futile." *Sai v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 126 (D.D.C. 2015). Amendment is futile when "the proposed claim would not survive a motion to dismiss." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996).

The Court concludes that granting Plaintiff leave to file his third amended complaint would be futile. Plaintiff's proposed third amended complaint does not cure any of the defects the Court has identified with Plaintiff's second amended complaint. Instead, it continues to assert several claims over which the Court lacks jurisdiction or that fail under Rule 12(b)(6). Plaintiff has not provided any additional factual information that would support his standing to sue TCU/IAM; his claims against President Biden remain barred by official immunity or are moot; and he continues to lack a private right of action under the OSHA Act and a remedy under *Bivens* for Amtrak's allegedly unconstitutional policy. Plaintiff has also failed to add any additional factual allegations that render his § 1985(3) conspiracy claim more than speculative. Accordingly, the majority of Plaintiff's revised third amended complaint would not survive a motion to dismiss for the same reasons his second amended complaint warrants dismissal.

Plaintiff's revised proposed third amended complaint, Dkt. 48-1, does differ from his second amended complaint in three relevant respects, none of which salvages his suit. First, the proposed third amended complaint names President Biden in his official capacity. *See* Dkt. 48-1 at 15 (Proposed TAC ¶ 16(c)). Second, it proposes to add both UNITE HERE Local 23 and ASWC as union defendants on all claims Plaintiff initially brought against TCU/IAM. *Id.* at 16 (Proposed TAC ¶¶ 16(d), (f)). And third, Plaintiff has included additional factual allegations related to his fraudulent concealment claim, namely that Defendants made false representations that the COVID-19 vaccine would prevent transmission of the virus and that vaccination was necessary to protect others from infection. *See id.* at 36–37, 56–57 (Proposed TAC ¶¶ 15(a)–115(f), 206(a)–206(d)).[10] The Court will address each of these proposed revisions in turn.

First, Plaintiff's proposal to name President Biden as a defendant in his official capacity would be futile because, as the Court has already explained, all of Plaintiff's official-capacity claims against President Biden are either barred by sovereign immunity to the extent he seeks damages, *see Clark*, 750 F.2d at 103, or are moot to the extent he seeks prospective declaratory or injunctive relief, *see supra* pp. 35–36. Nothing in Plaintiff's proposed third amended complaint cures these defects, nor could it. No waiver of sovereign immunity allows a plaintiff to sue the (present or former) President of the United States for damages arising out of allegedly unlawful Executive Orders, and no exception to mootness applies to preserve a live controversy with respect to these long-since rescinded policies.

With respect to Plaintiff's proposal to add ASWC and UNITE HERE Local 23 as additional union defendants, the Court concludes that Plaintiff's claims would not survive a

[10] The Court again refers to the paragraph numbering in Plaintiff's revised proposed third amended complaint, even though some paragraphs appear to be misnumbered.

motion to dismiss. To start, it appears that Plaintiff remains confused about which union to name—or, at least, has shown a lack of care in drafting the proposed, third amended complaint. Although he refers to UNITE HERE Local 23 in the body of the complaint, he continues to name UNITE HERE 43 in the caption. But even assuming Plaintiff has finally identified the correct union defendant against which to bring his claims, his claims against that union—or any other union—are seemingly time barred. Plaintiff presses claims against the union defendants on the same grounds that he asserted against TCU/IAM: breach of the duty of fair representation, wrongful discharge in violation of the OSHA Act, fraudulent concealment under D.C. law, and conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985(3). As the Court has already explained, Plaintiff's non-DFR claims are all, in substance, repackagings of his DFR claim because they are all premised on the union defendants' alleged failure to satisfy their duty of representation, rather than on independent factual allegations. *See supra* pp. 25–28. And, once Plaintiff's claims are properly characterized, the Court would need to apply the applicable statute of limitations, which has long-since expired.

Claims under the Railway Labor Act for breach of the duty of fair representation are subject to a six-month statute of limitations. *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 931 (D.C. Cir. 2013). Plaintiff's complaint alleges that Amtrak adopted its COVID-19 vaccination policy in August 2021, Dkt. 48-1 at 30 (Proposed TAC ¶ 81), and that he was discharged on July 13, 2022, following the disciplinary hearing in which he was represented by his union, *id.* at 33 (Proposed TAC ¶ 98). The allegedly unlawful acts on which Plaintiff's claims are based thus occurred between three and four years before he filed his initial complaint, *see* Dkt. 1 (Compl.), and he fails to identify any basis for even arguing that the statute of limitation was tolled Thus,

even giving Plaintiff the benefit of the relation-back doctrine, his DFR claims are time-barred, and granting him leave to amend his complaint to add these claims would be futile.

Finally, Plaintiff's proposed additional allegations of misrepresentation do not salvage his fraudulent-concealment claim. Even assuming that Amtrak owed Plaintiff a duty to disclose the information Plaintiff contends it fraudulently concealed—and, as explained above, Plaintiff has failed to allege facts sufficient to sustain such a claim—his revised, proposed third amended complaint still fails to state a claim upon which relief can be granted. Although Plaintiff's allegations provide somewhat greater specificity regarding representations Plaintiff contends were fraudulent, Plaintiff still cannot succeed because his proposed revised complaint does not allege that Amtrak made such representations, even if false, with the intent to defraud him or that he took any action in justifiable reliance on such representations. Plaintiff alleges only that Amtrak and the union defendants "relied upon and repeated" federal officials' allegedly untrue representations that the COVID-19 vaccine would prevent transmission of the virus and concealed the scientific evidence to the contrary. Dkt. 48-1 at 37 (Proposed TAC ¶ 115(c)); *see also id.* at 56–57 (Proposed TAC ¶¶ 206(a)–206(d)). To make out a fraudulent concealment claim, however, Plaintiff must allege not only that Amtrak made false representations or omissions but also that Amtrak did so with the intent to defraud, *Howard Univ.*, 857 F. Supp. 2d at 75, and that he relied on those representations or omissions. Here, far from alleging that Amtrak intended to defraud or that he relied on Amtrak's intentionally false statements, Plaintiff alleges that Amtrak followed federal policy and that he refused to comply with Amtrak's COVID-19 vaccine policy for reasons wholly unrelated to any representations regarding the efficacy of vaccines in preventing the spread of the virus. Granting Plaintiff leave to amend his complaint with respect to his fraudulent concealment claim would therefore be futile.

For the foregoing reasons, the Court will deny Plaintiff's motion for leave to file a third amended complaint as futile.

**E. Motion for Sanctions**

That leaves TCU/IAM's motion for sanctions against Plaintiff's counsel, Jo Saint-George, for her refusal to dismiss TCU/IAM as a defendant, even though she is—and has long been—aware that TCU/IAM was not Plaintiff's union. *See* Dkt. 39. TCU/IAM's motion satisfies the procedural requirements for seeking sanctions. TCU/IAM represents that on February 26, 2026, it served Ms. Saint-George with a copy of its motion and provided the requisite 21 days to resolve the issue in good faith before filing the motion with the Court. Dkt. 39 at 2; *see also* Fed. R. Civ. P. 11(c)(2). Ms. Saint-George did not voluntarily dismiss TCU/IAM nor seek leave to amend Plaintiff's complaint to remove the claims against TCU/IAM within the 21-day period contemplated by Rule 11, and TCU/IAM filed this motion on March 31, 2026, *see* Dkt. 39.

As TCU/IAM acknowledges, Plaintiff named TCU/IAM as a defendant in this action before Ms. Saint-George officially appeared as counsel, when he was proceeding *pro se*. Although there is reason to believe that Ms. Saint-George was advising Plaintiff at the time he filed the second amended complaint, she did not sign, file, or submit the pleading to the Court for purposes of Rule 11. *See* Fed. R. Civ. P. 11(b). She has, however, "advocat[ed]" for retaining TCU/IAM as a defendant, *id.*, and has declined entreaties to drop TCU/IAM from the case, despite knowing that TCU/IAM was not Plaintiff's union. Based on this refusal to drop TCU/IAM from the case, TCU/IAM seeks sanctions. Dkt. 39-1. As TCU/IAM stresses, not only should Ms. Saint-George have known that TCU/IAM was not Plaintiff's union, she acknowledged that Plaintiff "inadvertent[ly]" named the "incorrect" union, Dkt. 26 at 2, yet has repeatedly declined to drop TCU/IAM from the suit.

Although a close question, the Court is unpersuaded that Ms. Saint-George's actions to date warrant the imposition of sanctions. The question is a close because (at least at times) Ms. Saint-George has abandoned the demonstrably false allegation that TCU/IAM "was the union representing Plaintiff at the time of the events outlined" in the second amended complaint, Dkt. 10 at 13 (SAC ¶ 16(a)), and has sought to defend Plaintiff's decision to name TCU/IAM as a party on alternative grounds, Dkt. 26 at 2; Dkt. 36 at 25–26. At other times, however, she has continued to submit pleadings that allege (or that seek to allege) that TCU/IAM "was the union representing Plaintiff," Dkt. 48-1 at 15 (Proposed TAC ¶ 16(a)). Moreover, the alternative grounds that she has identified—the contention that Plaintiff's assertion of class action allegations might permit him to bring claims against other unions on behalf of similarly situated Amtrak employees, Dkt. 26 at 2, and the contention that TCU/IAM owed Plaintiff a statutory duty under the RLA because it was a signatory to the same collective bargaining agreement as UNITE HERE and ASWC and because fair representation duties may extend beyond formal membership, Dkt. 36 at 25–26—are either frivolous or unsupported by any authority cited in Plaintiff's pleadings.

Up to this point, the Court is prepared to attribute Ms. Saint-George's conduct to a lack of care and to her effort to find some post-hoc rationalization for mistakenly naming TCU/IAM as a defendant. Neither explanation is laudable, and repeated failings of this type may warrant the imposition of sanctions. But, on the current record, the Court is unpersuaded that counsel is engaged in a pattern of intentional harassment. The question, then, is whether Plaintiff's counsel has presented pleadings to the Court that include factual allegations unsupported by reasonable inquiry or that are premised on legal theories that are unsupported by "existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing

new law." Fed. R. Civ. P. 11(b). In this respect, the Court notes that counsel may (or may not) have helped Plaintiff prepare his pro se filings, including his second amended complaint, but she did not sign, file, or submit those pleadings. Nor has she advocated for those filings by arguing, in the face of the uncontroverted evidence, that TCU/IAM was Plaintiff's union; to the contrary, as TCU/IAM stresses, she has conceded the point. To be sure, she has carelessly included allegations asserting the TCU/IAM was Plaintiff's union in both versions of her proposed, third amended complaint, but the union has not moved for sanctions—or sent counsel a Rule 11 letter—regarding that carelessness.

That leaves the question whether the legal theories that she now invokes find support in any existing law or in any nonfrivolous argument for establishing new law. Her argument that Plaintiff's class allegations somehow support claims against a union that did not represent Plaintiff arguably fails that test. As explained above, under well-established law, a plaintiff who is not a member of the class that he purports to represent cannot bring claims on behalf of that class, and Plaintiff's counsel offers no argument for revisiting that established law. But it appears that Plaintiff has also abandoned that misguided theory for suing TCU/IAM, and she now argues that ASWC, TCU/IAM, and UNITE HERE somehow represented their members in some collective manner and that, as a result, TCU/IAM may have owed a duty of fair representation to members of UNITE HERE. Plaintiff's counsel cites no authority for that novel theory, nor does she recite any facts that might support it. In short, she arguably falls short on both prongs of the Rule 11 test.

Refocused in this manner, the problem with TCU/IAM's motion for sanctions is that TCU/IAM did not serve a Rule 11 letter on Plaintiff's counsel requesting that she withdraw her most recent theory of liability, which concedes that Plaintiff was not a member of TCU/IAM,

before facing sanctions. To be sure, the union has been steadfast in urging counsel to drop her claims against it, and Plaintiff's counsel has been equally steadfast in her refusal to do so. But given the relevant background, including the fact that counsel did not file the second amended complaint and promptly (albeit imperfectly) conceded that Plaintiff was not a member of TCU/IAM, the Court is prepared to give Plaintiff's counsel one last warning—and one last chance—before imposing sanctions. It is safe to assume, however, that the repeated pursuit of claims against a union that did not represent Plaintiff based on legal theories that find no support in the facts or law can—and eventually will—constitute an abuse of the judicial process for which sanctions are warranted. *See Wallace v. Saffa*, No. 6-cv-402, 2007 WL 1020791, at *2 (D.D.C. Mar. 30, 2007).

The Court will, accordingly, deny TUC/IAM's motion for Rule 11 sanctions but cautions counsel that any continued conduct of the type discussed above will, as appropriate, result in the imposition of sanctions. Rule 11 requires a lawyer to do more than spin out some theory—or some words that sound like a theory—that might conceivably correct a previous misstep in a case, without any factual or legal support for that theory or those words. In order to ensure counsel's attention to her responsibilities, the Court will require Plaintiff's counsel to include a separate certification in all future filings affirming that each complies with the dictates of Rule 11. Although that certification is implicit whenever an attorney (or unrepresented party) files "a pleading, written motion, or other paper," Fed. R. Civ. P. 11(b), counsel's conduct to date warrants repeated reminder of this obligation.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' motions to dismiss, Dkt. 21 & Dkt. 32, will **DISMISS** Plaintiff's second amended complaint, Dkt. 10, will **DENY** Plaintiff's motion for leave to file a third amended complaint, Dkt. 44, and will **DENY** TCU/IAM's motion for sanctions, Dkt. 39. Unless Plaintiff moves for leave to file a further amended complaint that addresses the substantial (and perhaps insurmountable) difficulties identified herein (and that certifies that the new, proposed complaint satisfies the requirements of Rule 11) on or before November 6, 2026, the Court will enter final judgment.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: October 19, 2026